THE STATE ex rel. ELLIOTT W. MAJOR, Attorney-General, v. THOMAS F. RYAN, CHESLEY A. MOSMAN and LUCIEN J. EASTIN.

In Banc, December 31, 1910.

1. **JURY: Inapplicable Statute.** If a statute under which juries for the courts of Buchanan county are selected is no longer available, because of a decrease in requisite population, there yet remains the constitutional provision that "the right to trial by jury, as heretofore enjoyed, shall remain inviolate," under which common law right jurors may be summoned as talesmen as occasion may require, or article 3 of chapter 64, Revised Statutes 1909, applies to that county, and if one or both do not meet the full ends of justice the General Assembly can supply the deficiencies. The county is not left without any jury law whatever simply because the Act of 1905 as amended in 1907, creating a board of jury commissioners for that county, is no longer applicable to that county.

2. **STATUTE: Classification by Population: Decrease.** Where counties are classified according to population, courts or legislatures do not assume that the number of their inhabitants will never decrease. Simply because a certain county had the requisite population at the time a statute was enacted, and therefore came within a statutory class, it will not be held that it

State ex rel. v. Ryan.

continued to remain in that class after its population decreased below the statutory standard. Even if this were the rule for cities in that regard (namely, that a city once admitted to a class because of requisite population will not be taken from that class because of a decrease of its population below the minimum standard), it would not be applicable to counties, since they pass automatically from one class to another, while cities do not, but only by virtue of a vote of the people.

3. **SPECIAL LAW: Courts: Juries.** Cases holding valid, against the objection that they were local or special, acts creating some new court, or a new division of an existing court, or regulating changes of venue from one division of the court to another, or providing that terms of a circuit court should be held at some town other than the county seat, were properly decided, because the Constitution authorizes legislation of the character of those acts; but it has no such provision concerning juries; on the contrary it says that "the General Assembly shall not pass any local or special law summoning or impaneling grand or petit juries."

4. ————: **Counties: Classification by Population: Decrease Below Standard.** Where population is the sole basis of classification, it would be class legislation to permit a county which had the requisite population at the time the statute was enacted to remain in that class after its population had decreased below the minimum population, while keeping out other counties which have equal population but less than the minimum fixed by the statute. Where the statute divides counties into classes by population, and fixes the method of selecting juries in each class, a county whose population decreases below the minimum fixed by the statute, passes automatically to the next lower class.

5. ————: ————: ————: **Jury Commissioners of Buchanan County: Ouster.** The statute enacted in 1905-7 provided that "in each county of this State now containing or which may contain hereafter a city having, according to the last preceding national census, more than 100,000 inhabitants and less than 400,000," petit jurors should be selected by a board of jury commissioners composed of the judges of the circuit court and the criminal court, and gave to those judges $1500 per annum for their services as such jury commissioners. The last national census taken prior to the enactment of the statute gave St. Joseph a population in excess of 100,000, but the same census for 1910 reduced that population to about 77,000. *Held,* that Buchanan county automatically passed out of the class upon the ascertainment by the last national census that the population of St. Joseph was less than 100,000 and that the jury commissioners as such must be ousted.

Quo Warranto.

WRIT OF OUSTER GIVEN.

*Elliott W. Major,* Attorney-General, *Thos. B. Allen, Chas. H. Mayer* and *Culver, Phillip & Spencer* for relator.

*C. C. Crow, K. B. Randolph, J. W. Boyd* and *Brown & Dolman* for respondents.

LAMM, J.—Respondents are severally judges of the criminal court of Buchanan county and of subdivisions one and two of the Buchanan Circuit Court.

The Attorney-General exhibits here an information, *ex officio,* in the nature of *quo warranto,* to try the title of respondents to the office of, and to oust them as, a Board of Jury Commissioners of Buchanan county.

The information pleads by title and sections two acts of the General Assembly—one found in the Laws of 1905, p. 174, entitled, "Jurors: Board of Commissioners in Counties containing City of 150,000 and less than 400,000 Inhabitants"—the other, in the Laws of 1907, p. 322, amendatory of the first.

The information shows that as amended in 1907, section 1 of the first act now reads: "In each county of this State now containing or which may contain hereafter a city having, according to the last preceding national census, more than one hundred thousand inhabitants and less than four hundred thousand inhabitants, petit jurors for the circuit court and for the court having jurisdiction of felony cases shall be selected as hereinafter provided."

Section 2 of the original act, not amended, in part reads: "The circuit judges of said counties, and the judge of the court having jurisdiction in felony cases, shall be and constitute a board of jury commissioners for such counties, a majority of whom shall constitute a quorum for the transaction of business. . . . Each member of said board shall, as compensation for his

services under this act, as jury commissioner solely, receive a salary of fifteen hundred dollars *per annum.* Said salaries shall be paid by the county monthly in equal monthly installments. The time, place and manner of meetings of said board and the rules for performing its duties shall be fixed by said board.

As amended in 1907, section 3 of the original act now reads: "In every county in this State to which this act may apply, the board of jury commissioners of said county, at its first regular meeting, after it is ascertained from the last preceding national census that said county contains a city of more than one hundred thousand inhabitants, and less than four hundred thousand inhabitants, shall cause to be made, under its supervision, a complete list, as near as they can, alphabetically arranged, of all the qualified jurors in the county and their residences; and in compiling said list said board of jury commissioners, and their clerks and assistants, may have access to the books of the county assessor and to any registration of voters required by law to be made."

The amendatory act had an emergency clause based on the "necessity of the immediate revision of the jury laws in counties affected by its provisions," and was approved February 26, 1907. The original act had the same emergency clause and was approved February 21, 1905. The other provisions of the original act, not amended, consist of 14 sections, working out the details of the plan—all immaterial here. The original act ran in favor of every county of the State "now containing or which may contain hereafter" a city having, according to the last preceding national census, more than 150,00 and less than 400,000 inhabitants. At the outset the act took effect in only one county—that of Jackson—Kansas City being the only town then fitting the statutory requirement in population. The amendatory act of 1907, by reducing the requirement in population to 100,000, including Buchanan

county—the city of St. Joseph, contained therein, according to the then last national census having the required number.

Further outlining the information, its theory is that according to the national census of 1910, as officially promulgated, the city of St. Joseph does not contain 100,000 inhabitants, nor does the county of Buchanan have so many; that by virtue of the Act of 1905 as amended in 1907, respondents at once assumed the office of jury commissioners in Buchanan county, constituting its board of jury commissioners, put on foot its jury scheme and took to themselves its duties, honors and *solatium;* that by virtue of the official promulgation of the national census of 1910, establishing the fact that the population of St. Joseph was less than 100,000, the law ceased to be operative in Buchanan county; and that such board of jury commissioners became *functus officio* and no longer had any right to legal existence. It is charged that despite that fact respondents continued to perform and are performing such duties and usurping the office of jury commissioners "in contempt and to great prejudice and damage of the authority of the State of Missouri." Process was prayed against them that they be cited to make answer to the State and show by what authority they claimed to use and enjoy the rights, liberties, privileges and franchise aforesaid.

The suit is a friendly one to set at rest a vexed question relating to selecting jurors for service in the courts of Buchanan county.

Respondents enter their voluntary appearance, submitting the cause on demurrer—the grounds of which are:

"First. The petition in *quo warranto* filed by the Attorney-General does not state facts sufficient to constitute a cause of action against respondents.

232 Sup—6

"Second.  The petition on its face shows that respondents are lawfully performing the duty of jury commissioners in Buchanan county, Missouri."

We are furnished with forceful briefs of excellent pith and temper on both sides.  A resume of points there made will aptly and concisely outline the general contentions *pro* and *con,* viz.:

For respondents (*inter alia*) it is argued it was the intention of the Legislature in the Act of 1905 as amended in 1907 that it should afford a permanent jury system for Buchanan county without reference to any possible decline in its population; that in framing the various jury laws of this State no attempt has been made to create a general system founded upon population either urban or general; that in framing the law under consideration the Legislature was skillful and intelligent in the selection and use of words expressive of its purpose to make the law applicable to Buchanan county irrespective of any future decrease in the population of St. Joseph; that the act is not a local or special law; and that if that act is not operative in Buchanan county, then it has no jury law—this by virtue of the fact that prior laws operative in that county have either been repealed or are no longer applicable.

For relator (*inter alia*) it is argued that for the purpose of prescribing the manner of selecting petit jurors the Legislature has classified the counties of this State, and cities which are separate from counties, according to population; and that, since the population of St. Joseph as shown by the last national census is less than 100,000, Buchanan county, as to the manner of selecting petit jurors for the circuit and criminal courts, is not now subject to the provisions of the Act of 1905 as amended in 1907.

There is a reply brief controverting the propositions and arguments in respondents'.

In our opinion, a judgment of ouster will have to go. This, because:

(a). To show they are not overlooked, we shall consider some phases of the argument of respondents' counsel *in limine*. For example:

(1). By way of argument *ab inconvenienti* they say unless we accept their construction of the statutes, then Buchanan county is left facing chaos without any jury law whatever. We shall not elaborate the theory. In a nutshell it is that the present jury statutes are compiled in chapter 64, Revised Statutes 1909, under five articles. Article 2 relates to "juries in counties having 100,000 and not more than 175,000 inhabitants" —manifestly Buchanan does not fall in this class. Article 3 relates to "juries in counties containing cities of 50,000 and less than 300,000 inhabitants"—manifestly Buchanan county would fall in this class on the face of things, except some insurmountable obstacle intervenes —which obstacle they say does intervene. Article 4 relates to "juries in counties containing cities of 100,-000 and less than 400,000 inhabitants"—obviously Buchanan does not fall in that class—unless the doctrine of once in, always in, applies (article 4 is the aforesaid Act of 1905 as amended in 1907). Article 5 relates to "juries in cities with over 100,000 inhabitants"—Buchanan does not belong there. Article 1 relates to juries generally, in all counties, "except in cities having over 300,000 inhabitants, and in counties containing cities of 50,000 inhabitants and less than 300,000." It is obvious at a glance that article 1, article 5 and article 4 seem to overlap on their outer edges at first blush and may need the pruning hand of a reviser, but that does not concern us in the determination of the instant case.

The phase of relator's argument now up travels on the theory that article 1 of the present chapter 64 was passed in 1879, article 3 in 1891, article 2 in 1903, article 4 in 1905-7; that article 2 was a new law and not

an amendment of any existing act; that it operated to repeal article 3 passed in 1891, as said, so far as concerned counties which at that time contained or might thereafter contain not less than 100,000 and not more than 175,000 inhabitants, in which class Buchanan county belonged at the time—therefore, as the Act of 1903 (art. 2) repealed the Act of 1891 (art. 3), unless the Act of 1905-7 applies there is no jury law applicable to Buchanan. The contention, subtle and somewhat elusive to the grasp, it will not be necessary to fully develop because of a conclusion to be presently stated.

To this argument relator presents the counter view that the "repeal" in the minds of respondents was not an express repeal, but results, if at all, only by implication, and is the product of over refinement; that the two acts are not irreconcilably in conflict and since repeal by implication is never favored and is not allowed except in case of an irreconcilable conflict between a younger and an elder act, it results that both may stand, *ergo,* Buchanan county has left an existing statutory jury scheme, viz., article 3, which it can fall back on. But we need not follow the ingenious evolution of the argument for and against, nor decide the dainty questions presented in that behalf. This, because one of two things is bound to be true if Buchanan county ceases to come under article 4, and if either exist the argument *ab inconvenienti* must fall. Those two things are: Either Buchanan county has left the common law right to jurors summoned as talesmen as occasion may require in obedience to the constitutional provision (sec. 28, art. 2), viz., "The right of trial by jury, as heretofore enjoyed, shall remain inviolate," or article 3 of chapter 64, supra, applies to that county. If the one or the other or both of these schemes do not meet the full ends of justice because of facts appropriately within legislative knowledge, and calling for the exercise of legislative power, then the General Assembly about to convene can amend either article 2, article 3 or

article 4, so that a statutory scheme may be enacted, curing the sickness of the State by striking down mischiefs.

(2). To further their main argument, counsel say courts do not interpret nor legislatures pass laws on the assumption that the population of a town will *decrease*, citing Davis v. Clark, 106 Pa. St. 1. c. 384 *et seq*. The Davis case held in judgment the constitutionality of a mechanics' lien act—the question turning on a clause reading: "Provided that the provisions of this act shall not apply to counties having a population of over two hundred thousand inhabitants." At that time two counties in that State, Philadelphia and Allegheny, had a greater population. The act was held bad, as obnoxious to a constitutional interdiction, viz., "The General Assembly shall not pass any local or special law, authorizing the creation, extension or impairing of liens." In holding the act bad, that court said: "It was not, then, a general act, applicable to every part of the commonwealth. It did apply to a great number of counties; but there is no dividing line between a local, and a general statute. It must be either the one or the other. If it apply to the whole State it is general. If to a part only, it is local. As a legal principle it is as effectually local when it applies to sixty-five counties out of the sixty-seven, as if it applied to one county only. The exclusion of a single county from the operation of the act makes it local." However, the case sustained a classification by population, putting the classification on the theory of the assumption that counties having a small population, may ultimately have one much larger. But the converse was not allowed as a correct assumption. "Here," said the court, "the larger are excluded. *We cannot assume that their population will ever be reduced to less than the number named*. They are therefore practically and permanently excluded by the intent and

purpose of this act, which is special in its terms and local in its effect.''

We have no call to approve or disapprove the result there reached, but the assumption indulged in the Davis case that laws are always interpreted as if passed on the theory a population will remain stationary or increase, and that there can be no assumption it will ever decrease, or that the lawmaker enacts laws under that assumption, must be taken *cum grano salis*.

If a classification by population is not arbitrary in the sense of being unreasonable, and if, therefore, it is not obnoxious as special and local legislation, we can see no inherent reason why the county or officer that goes in under a law through an increase in population may not (by the same token) go out under a decrease— the result hinging in each instance on a reasonable construction of the words and spirit of the law. Speaking of shifts in populations, the census tells the same story history has always told, viz., that populations wax and wane, stand or shift as different causes operate to produce different effects. The school boy reads that story in his Herodotus and in many a page since. The old materialistic poet, Khayyam, mockingly toying with the moral phenomena of human life, had it in mind in the quartet of lines of his Rubaiyat:

"They say the Lion and the Lizard keep
    The Courts where Jamshyd gloried and drank deep:
And Bahram, that great Hunter—the wild Ass
    Stamps o'er his Head, but cannot break his sleep."

It is not without the pale of sober speculation, for did not the noble Whig historian, reviewing Ranke's History of the Popes, see in his mind's eye "some traveler from New Zealand, in the midst of a solitude, take his stand on a broken arch of London Bridge to sketch the ruins of St. Paul's?" Even in Missouri, we are pointed by relator's counsel to "the departed glor-

ies of our own Weston, once the Mecca and metropolis of Northwest Missouri.'' And does the student of our annals need to be reminded of (Old) Franklin on ''Cooper's Bottom,''. its early pre-eminence in the Boone's Lick Country, its bounding hopes, its trade stretching away to Santa Fe, its lottery, pouring venal wealth into its lap, its gay life, its near-by Hardeman's Garden—a dream of flowers, fruits and labyrinths of pleasant walks—one and all faded like the fog before a morning sun, and now nothing but a dim reminiscence, amusing the idle moments of a prying scholar like Walter Williams? And what of Sparta in Buchanan county —once a rival of the town of Joseph Robidoux? *Sic transit gloria mundi!*

We are not prepared to rule that lawmakers, presumably wise men, in using population as a standard of classification, do not look before and behind and may not assume that populations may not both wane and wax. Hence, we decline to follow the lead of that phase of respondents' argument. Once in, always in, is a dogma we do not subscribe to as an invariable rule in legal hermeneutics in cases like the one at bar.

(3). We are told we have held valid, as against the objection that such acts were local and special, acts creating some new court, or a new division of an existing court, or regulating taking changes of venue from one division to another, or providing that the term of a certain court should be held at some town other than the county seat, etc. We are cited to a line of such cases.

Respondents argue that cases which sustain that sort of legislation support their construction of the Act of 1905-7, under which the existing jury scheme in Buchanan county is operated. The office of this phase of their argument is to parry the thrust in relator's brief that, if respondents' construction of the Act of 1905-7 be adopted, then, by that ruling, the law becomes a local and special act and invalid as such. Hence (re-

lator says), that construction is vicious, for that where
two constructions are open—one validating the law,
the other destroying it—we are bound to take the first
instead of the last, so as to make the law stand rather
than fall. *Interpretatio fienda est ut res magis valeat
quam pereat.* To further their argument respondents
advance the notion that the General Assembly might
have passed a valid jury law dealing by name with
Jackson or Buchanan county, one or both, with pro-
visions impliedly excluding all other counties and hav-
ing no regard to population; that the population idea
may be treated as surplusage; that, in reason, as ap-
plied to juries, it stands on a lame foot or none at all;
that the population idea was merely inserted in the law
because the lawmakers saw some *"imaginary"* consti-
tutional difficulty to get around; that the several ar-
ticles of chapter 64, pertaining to juries, were passed
to meet a well-defined and well-understood *local* neces-
sity; that such necessity exists in St. Joseph, whether
its population be a hundred thousand or less. Indeed,
counsel in their ardor claim to see in the peculiar ver-
biage of the act in question a substantial legislative in-
tent, thinly veiled, to keep all counties who get in under
the law, in, while making it as difficult as possible for
other counties to get in—in other words, a spirit of ex-
clusiveness.

We will copy a little from respondents' brief to
illustrate the delicate scope and character of this side
of their argument.

At one place they say: ''If there is any one thing
more striking than another in connection with the
growth of these jury laws it is that in their enactment
there has been no attempt to create a uniform system
based upon population. All the numerous amend-
ments which constitute the present body of the law on
that subject were passed to meet the needs and at the
demand of some particular community, and in each case
a new rule has been introduced, founded upon the ac-

State ex rel. v. Ryan.

tual population of the county or city to be affected, and guarding it as effectively as possible against the intrusion of new members, by growth or otherwise, upon the exclusiveness of the newly created family. In each case, to meet some fancied constitutional necessity, . . . a provision has been inserted applicable to future conditions assumed to be possible, thus making the Constitution an instrument of evasions and subterfuges by which lingual tricks are substituted for the direct and simple statement which should characterize the laws.''

In another, this: ''Conditions certainly prove that the national census alone is not a reasonable test for such needs, and a short review of the several jury laws of the State will not only show that the Legislature never intended to adopt a system founded on it, but that every act making it an element was framed to meet a public necessity founded upon peculiar local conditions, that as fast as a necessity arose in any city an act was framed to meet it, regardless of the condition in any other locality, population being mentioned merely to avoid an imaginary constitutional objection, as if the constitution were made to promote subterfuges rather than to control action.''

In another, referring to the act, they say: ''It curtained the front door as with a cobweb to catch any county flying in thereat.''

As presently seen, in another paragraph of this opinion, classification by population (under different forms of verbiage) is a favorite method of classification in our statutes. In passing such laws an attempt has been made to ground them solidly on the Constitution, strictly observing the interdiction against mere special or local legislation.

We dismiss this phase of respondents' argument by suggesting that we cannot very well allow it sound in the face of a Constitution which provides, as does ours, that (art. 4, sec. 53): ''The General Assembly

shall not pass any local or special law . . . *summoning or impaneling grand or petit juries*, . . . and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject.''

Referring to the point made in the first part of this paragraph, to the effect that those cases holding that an act referring to some particular court, or to some term of that court, or to the place some term of that court should be held, etc., and seeking to apply the doctrine of those cases to this, we observe: It is obvious that the principle upon which those cases are grounded does not apply in the instant case. The reason given for the doctrine of that line of cases is that the *Constitution authorizes that character of legislation.* [State ex rel. v. Fort, 210 Mo. l. c. 532, *et seq.*] It has been said that the judicial system of the State is a whole; ''a composite unit;'' that statutes dealing with courts as such have been usually held general though not applicable to every court of like nature in the State. [State ex rel. v. Shields, 4 Mo. App. 259.] The idea of unity in the judicial system is instructively dealt with by our Brother VALLIANT in Zellars v. Surety Co., 210 Mo. l. c. and 106 (*q. v.*).

(4). Respondents seek to borrow aid from a conceded doctrine, viz., that under the statutory plan for classification of cities it is not pretended that a city organized under one class, although a certain population is a *sine qua non* to such organization, retrogrades to a lower class when its population falls off. They say, in effect, that when the door opens to let a city into a class, it swings inward, not outward—in other words: Once in, always in, despite the adventitious fact that its population ebbs or swells. As to this view of it, we observe: The fundamental fallacy in applying that idea lies in the fact that while parity of reasoning is allowable reasoning yet (to be worth while) it must

be reasoning from similars to similars, and here all similarity in the two cases vanishes. A city does not pass from one class to another automatically as counties do under the jury chapter. It passes by virtue of a vote of its people—its people shed their old charter, soul and shell, and assume new ones—the vote of the people in adopting the change being strictly in the nature of an act of incorporation—an entity is born, a municipal corporation, an artificial person, that may not lose its life and charter franchises otherwise than by another act of sovereignty, viz., another vote of the people reincorporating the city in another class. [See art. 1, chap. 91, and secs. 5263, 5489, 5751, 5894, 6004, R. S. 1899.] We cannot see how respondents' case prospers on the theory advanced.

With the foregoing disposition of subsidiary and collateral questions, we come to the main proposition in the case.

(b). That proposition is this: Attending to what has already been said in paragraph (a), does the Act of 1905-7 (now, art. 4 of ch. 64, R. S. 1909) now apply to Buchanan county? If it does, the writ of ouster should not go—if not, otherwise.

(1). A consideration of the question must proceed on the theory that the city of St. Joseph has lost the requisite population to make the act apply on its face, or, more precisely stated, the county of Buchanan if not under the act could not come in at this time. It got in under the Federal census of 1900, and the question is: Can it stay in although the Federal census of 1910 cuts the population of St. Joseph to 77,000 and makes the entire county have less than 100,000 souls?

That we may take judicial cognizance of the size of the population of a city or county, when once established by the national census, cannot be gainsaid. But we do not here need the doctrine of judicial notice; for in this case the information alleges the official promulgation of the census figures at less than 100,000. The

demurrer admits facts (not absurd or impossible) when well pleaded. It remains to determine the legal significance of such facts so admitted.

(2). In expounding a statute one rule is that effect should be given to all its words, when possible, without violating reason; another is to consider the context, and those sections *in pari materia* as well as cognate sections, and get at the true intendment of the act, having regard to the maxim: The explanation should arise from the whole subject-matter (*Ex tota materia emergat resolutio*).

(3). In what we have to say we shall assume it settled doctrine that statutory classifications by population are not unphilosophical or unconstitutional but are sustained in reason. Counsel on both sides cite abundant authority to that proposition. The theory of classification by population in jury statutes was under consideration in Dunne v. Railroad, 131 Mo. 1. In that case the single point was made that the Act of 1891, Laws 1891, p. 172 (now, art. 3, chap. 64, R. S. 1909) was unconstitutional. It was held constitutional because the Federal census, furnishing *evidence* upon which the law operated, thereby furnished a basis of certainty in time and accuracy in manner, otherwise difficult to secure when the census is committed to local authorities of counties dominated by large cities; that the selection of juries under the general law in counties containing large cities is liable to much abuse, complaints were common and to remedy evils existing in condensed populations—not in one, but in all cities of a certain size—the classification was deemed necessary; that the act was not special legislation or local in its application—this because (and only because) it related to persons and things *as*, and not to persons and things *of*, a class—all counties being entitled to its provisions containing a city of the named population. The Dunne case did not consider the precise question presented here, viz., whether a county once in, stayed in; but that

phase of it relating to other counties getting in.  But is it not quite too plain for argument that if a county gets in because of having a city of the requisite size, it should go out and fall into some other class when it can no longer pass muster and toe the mark in population? Otherwise, a construction keeping a county in which could not get in (as its population stands at the time) would result in class legislation of the most patent and pernicious character.  To illustrate: If St. Joseph, the only large city making the law operate in Buchanan, has 77,000 inhabitants and that county can stay in the 100,000 class, then (as put by relator) although Springfield in Greene, Joplin in Jasper, or Sedalia in Pettis might have the same population yet the counties of Greene, Jasper and Pettis would be effectually barred from the benefits of the statute.  Thereby, we would have one law for one county and another law for another county of the same population, *though population is the sole pretended basis of classification.*  Such construction with one stroke mutilates the symmetry and general scope of the law, makes it local in terms and application—in other words, the whole act perishes by construction.  Therefore, if there is any other reasonable construction we should take that in order the law may stand and not fall.

There is another construction entirely consistent with the reason of the thing, which (unless we are constrained by the strict letter of the law) we should give; which is; that the statute opens automatically to let in (and out) of the same door those counties to which the law applies—the door swinging on a double hinge—in and out.  That is, a county gets in, or stays in or goes up to a higher or down to a lower class all by virtue of the law.  This view treats the situation, needing correction, as a continuous one.  Such a construction, if allowable, is due to the law-making branch of the government, because it would be odious to assume that lawmakers (absent unmistakable evidence of the fact)

intended to fly in the face of the unaccommodating sternness of the constitutional interdiction against special legislation.

(4). We shall presently see whether the words of the law forbid such construction. For the present let us look to cognate laws and to the legislative policy evidenced by many statutes which we think fortifies the construction suggested. There is a statute (R. S. 1909, sec. 978) relating to giving to the circuit attorney in a circuit embracing a city of 300,000 or more inhabitants power to appoint five assistant circuit attorneys. Does such circuit attorney retain that power when his circuit ceases to contain a city of that size? Such circuit attorney has power to appoint clerks and stenographers (sec. 978). Now section 982 names a salary of $3000 for assistant circuit attorneys and $1200 for clerks and stenographers. Do such appointments and salaries continue when the circuit contains no such city? Section 1036, on a given population and taxable wealth, provides that in a county adjoining a city of a population of 300,000 the prosecuting attorney shall employ a clerk at the salary of $1000. Does such employment continue when such county no longer adjoins a city of that size? Section 1044 authorizes county courts in counties containing 100,000 inhabitants or more, according to the last census of the United States, and such as may hereafter contain that number, to appoint a county counselor at a salary of not more than $3000 nor less than $1500 (see sec. 1047). Does that authority exist and is that salary payable after the county dwindles below the population limit? Section 1005 grades the salaries of prosecuting attorneys on a sliding scale by modest leaps and bounds. The county of 5000 people pays $300; that of 10,000 pays $400; that from 10,000 to 15,000 pays $500; that of 15,000 and less than 20,000 pays $600; that of 20,000 and less than 25,000 pays $700; that of 25,000 and less than 30,000, $800; from 30,000 to 35,000 the salary is $900; and for

35,000 and over, $1000. Do those salaries continue when a county, by decrease, falls back from the class it may once be in to a lower class? Section 1006 is an attempt to classify counties according to the United States census of 1900, and undertakes to provide that prosecuting attorneys in counties of from 32,000 to 50,-000 inhabitants shall receive salaries of $2500 each and no other remuneration whatever. Because that statute, *ex vi termini,* cannot open to let other counties in or those that are in, out, on any possible hypothesis, it has been held unconstitutional by a decision just handed down (State ex rel. v. Williams, 232 Mo. 56). By section 4072 it is provided that in cities having or hereafter having a named population a probate clerk shall be elected. Does that statute mean that such clerk shall be elected and receive his *solatium* no difference how much the city dwindles below the population mark? By section 10,683 it is provided that in counties exceeding 50,000 inhabitants and having a criminal court, the judge thereof shall receive an annual salary of $3000. Does that statute mean that if the county hereafter falls below 50,000 souls, the judge of its criminal court, shall continue to receive $3000? By section 10,687 it is ordained that in a county of a certain population and of certain taxable wealth adjoining a city of a given population, the circuit judge shall receive the sum of one hundred and twenty-five dollars per month in addition to the salary now provided by law and the prosecuting attorney of such county the sum of fifty dollars per month in addition to his regular salary. Are those salaries to be paid when such county ceases to meet the definitions and limitations of the statute? By section 10,698 the remuneration of circuit clerks is regulated on a sliding scale of population. When that scale is applied in accordance with the population, does it become fixed and continue though the population falls below the standard? The general law is that the sheriff receives two dollars per day for himself and for each of

two deputies actually employed and in attendance upon court, but in cities and counties having over 100,000 inhabitants such deputies receive three dollars per day. In counties having 50,000 and under 600,000 sheriffs receive three dollars per day for each and every day's attendance during the term of each of the courts. Is the three dollars per diem to continue when the population falls below the statutory requirement? See in this connection section 10,702. By section 10,722 an elaborate scheme is enacted whereby clerks of courts are paid on a sliding scale, depending entirely on the population of the county. In counties of great population, a greater amount is paid, and a lesser when the population is less. When a county paying the largest amount ceases to have the statutory number of inhabitants, is the larger salary to continue? See in this connection section 10,727. By section 10,737 the idea of population in grading salaries is applied to counties having a population greater than 150,000 and less than 500,000. Does that salary scheme remain though the population does not? Doubtless other statutes might be mentioned of a kindred sort and the same pertinent inquiry spontaneously arises on each of them. In each the apple, salary, grows on the tree, population—cut down the tree, does not the apple fall? The *population* is the principal thing. Things following population are incidental or derivative. *Cessante primitivo cessat derivativus.*

Article 4, chapter 64, supra, we think comes within the legislative policy marked out in the body of the statutes considered. To eliminate the population requirement from that statute would affect the population idea in the rest, thereby doing violence to the law by corroding its bowels.

(5). The very words of the law remain to be considered. When the lawmaker plainly says what he means, to dotting his i's and crossing his t's, we have no call to say he means what we think he should mean.

Therefore, if the words of the lawmaker keep Buchanan county in its present class, we should say so, although thereby the act becomes bad constitutionally. Respondents argue that the grammatical construction is such that Buchanan county, once in, must be held to stay in by force of the words used. Those words are: "In each county of this State now containing or which may contain hereafter a city having," etc. We are not clear we grasp the nice shades of thought in the contention. Stated broadly the idea seems to be that there are two adverbs of time used—one, "now;" the other, "hereafter;" that the *now* refers to counties having a city of the right size at the time the law took effect; the *hereafter,* the counties getting a city of that size in the future. But may both "now" and "hereafter" not refer to the same county? May not the statute mean that any county gets in on a present showing of the right condition and stays in or goes out if that condition continues hereafter, and that any other county gets in, stays in or goes out the same way? There is nothing in the grammatical construction or context demanding we take a narrower or other view, and we prefer such view because it not only makes the statute constitutional but it comports with what we conceive to be the intendment of the statute.

On the theory that the situation is crying and that he gives twice who gives quickly, we have been pressed to an early decision of this case, brought since oral hearings were adjourned at the October call of our October term. Doubtless something of substance is lost by the fact that counsel were not permitted to argue *ore tenus.*

The English editors of the last English edition of Benjamin on Sales, the fifth, took time to consider and held the text in solution, if that term be permitted, such a time as provoked complaint. They offered a brace of

lines from Chaucer as their defense, running in old Anglo-Saxon thus:

> "There nis no workman whatsoever he be,
> That may both worke wel and hastily."

Mindful of the limitations suggested in that couplet, we have given the case the deliberation time allowed, resulting in the conclusion that the demurrer be overruled and a writ of ouster should go. Accordingly, one is ordered. Let the State pay the cost. All concur, except *Burgess, C. J.,* not sitting.