Lawrence R. MARIE, Respondent,

v.

STANDARD STEEL WORKS, a
Corporation, Employer,

and

Employers Mutual Liability Insurance
Company, Insurer, Appellants.

No. 46948.

Supreme Court of Missouri,

En Banc.

Jan. 12, 1959.

G. W. Marsalek, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, St. Louis, for appellants.

Harry C. Clark, Kansas City, for respondent.

STORCKMAN, Judge.

This is a Workmen's Compensation case in which the claimant, Lawrence R. Marie, seeks an award of compensation on the theory that he sustained a noise-induced loss of hearing as a result of occupational disease arising out of and in the course of his employment as a welder in the trailer-tank fabricating department of his employer, Standard Steel Works. The referee entered an award in favor of the claimant and against the employer and its insurer, Employers Mutual Liability Insurance Company. The employer and insurer filed an application for a review of the award and the Industrial Commission affirmed the award in all respects. An appeal was then taken to the Circuit Court of Clay County where the final award of the commission was affirmed. On appeal to the Kansas City Court of Appeals, the judgment was reversed. Marie v. Standard Steel Works, Mo.App., 311 S.W.2d 368. On application to this court the cause was ordered transferred.

The cause is before us for determination as if it were an original appeal to this court. Article V, § 10, Constitution of Missouri 1945; Supreme Court Rule 2.06, 42 V.A.M.S. The appellants concede that the evidence supports the commission's finding that the respondent sustained cumulative loss of hearing of 48.09% as a result of noise incidental to his employment. The principal questions are whether the claim-

ant's impaired hearing is a disability resulting from an occupational disease within the meaning of the Workmen's Compensation Act and whether the claim was filed within the one year statute of limitations provided by the act.

Mr. Marie, the claimant, was 39 years old at the time of the trial. He was originally employed in 1941, entered military service in 1942 and returned to his employment with Standard Steel Works in 1946. Since then he has worked continuously for the same employer as a welder, fabricating trailer-truck tanks. These tanks, designed principally for transportation of gasoline and oil, are divided into several compartments of various sizes separated by bulkheads. The tank itself was fashioned by placing the prefabricated steel in a jig and beating it with sledge hammers until the ends came together. Holes were then cut in the top of the tank for each compartment. The claimant, Marie, and other employees would then enter the compartments in order to weld the bulkheads in place. When the bulkheads were not exactly in position, it was necessary for Marie and his fellow employees to drive the bulkheads into their proper places with sledge hammers before welding them since the capacity of the compartment was determined by bulkheads being in proper position. Marie testified that he ordinarily worked inside the tanks practically all day except for the noon hour and that two to four men would be working on a tank at the same time, hammering continuously. The workers were subjected to a magnification of the noise of the operation by reason of their working on the inside of the tank. Usually other workers would be working and hammering on another tank within six feet of the one on which plaintiff was working. Metal finishers also working in this general area used disk grinders and polishers which made a loud high-pitched noise. Whenever a run was necessary for a particular part, there was noise from punch presses in the same department. The room was not acoustically treated. The conditions under which the claimant worked were substantially the same from 1946 to the date of the hearing.

Ear defenders or ear plugs, as they were sometimes called, were made available by the company in the First Aid room and bulletins were posted urging their use because the plant nurse felt that the noise might be detrimental to their ears. There was evidence that ear plugs tend to preserve hearing but employees did not wear them because they are not able to talk to each other or to hear shouted warnings of danger. Some of the employees wore cotton in their ears but the claimant did not do so because he felt it was of no help. Since the appellants do not contend that claimant's loss of hearing did not result from the noises incidental to his employment, it will not be necessary to set out in detail the medical and other evidence.

In affirming the award of the referee, the commission made additional findings of fact and conclusions of law which, omitting parts not here essential, are as follows: "We find and believe from all the evidence that noise of sufficient quality, intensity and duration can and does result in loss of hearing; that the employee, Lawrence R. Marie, while in the employ of Standard Steel Works, a corporation, worked in noise of a quality and quantity and over a sufficient period of time to result in loss of hearing; that said employee was required to and did work under conditions which constituted a particular and peculiar hazard of the employment and which subjected and exposed him to noise of an injurious intensity over a period of six or seven years; that, as a result thereof, said employee sustained cumulative damage to both inner ears; and that such exposure to noise occurring repetitively and culminating in disability, if ascribed to accident, would necessitate our dealing with innumerable traumatic episodes entailing innumerable dates of accident. Gould's Medical Dictionary, Fifth Edition, defines disease as 'a disturbance of function or structure of any organ or part of the body'. Occupational disease is not defined by statute in this state,

but occupational diseases have been defined as those that occur incident to employment and are due to some factor peculiar to the occupation. Therefore, compensation in this case is predicated on the basis of occupational disease as the result of gradual destruction or damage to the auditory nerve endings bilaterally, caused by the noise exposure in his occupation as found above.

"We further find that the employee, Lawrence R. Marie, sustained an occupational disease arising out of and in the course of his employment with Standard Steel Works, a corporation, on or about December 1, 1952, resulting in loss of hearing in both ears which entitles said employee to compensation for permanent partial disability in the amount of $30.00 per week for 80.803 weeks.

\*   \*   \*   \*   \*   \*

"We further find that the employer had notice of said occupational disease; that the employer was not prejudiced by the failure to give notice, as alleged, because there is no known medical treatment that will cure or relieve the claimant of his disability; that the claim for compensation was filed within the time prescribed by law for the reason that employee's alleged hearing loss was not reasonably discoverable or compensable until on or about December 1, 1952.

"We further find that the employer had accepted the occupational disease section of the Missouri Workmen's Compensation Law and was working under and subject to the provisions thereof. \*   \*   \*."

Essentially, the appellants' first contention is that the only occupational diseases cognizable under the Workmen's Compensation Act are those "caused by the handling, and lodging within the body, of chemically toxic substances" mentioned and referred to in § 292.310; and that the noise-induced hearing loss shown by the evidence is not an "occupational disease" within the meaning and intent of the Workmen's Compensation Act.

Occupational diseases were expressly excluded from the coverage of the original Missouri Workmen's Compensation Act. Laws of Missouri 1925, § 7, p. 380; § 3305(b), RSMo 1929. The coverage was made optional by the 1931 amendment. Laws of Missouri 1931, p. 382. Subsection (b) of § 3305, RSMo 1929 as amended, with the amended portion in italics, reads as follows (Laws of Missouri 1931, p. 383): "(b) The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury. The term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom. The said terms shall in no case *except as hereinafter provided* be construed to include occupational disease in any form, nor shall they be construed to include any contagious or infectious disease contracted during the course of the employment, nor shall they include death due to natural causes occurring while the workman is at work. 'Death' when mentioned as a basis for the right to compensation means only death resulting from such violence and its resultant effects occurring within three hundred weeks after the accident: *Provided,* that nothing in this chapter contained shall be construed to deprive employees of their rights under the laws of this state pertaining to occupational diseases, *unless the employer shall file with the commission a written notice that he elects to bring himself with respect to occupational disease within the provisions of this act and by keeping posted in a conspicuous place on his premises a notice thereof to be furnished by the commission, and any employee entering the services of such employer and any employee remaining in such service thirty days after the posting of such notice shall be conclusively presumed to have elected to accept this section unless he shall have filed with the commission*

*and his employer a written notice that he elects to reject this act."*

Thus by virtue of the 1931 amendment, now § 287.020(2, 3, 4), the employer may elect "to bring himself with respect to occupational disease within the provisions" of the act by notifying the commission and posting notices. When the employer so elects, his employees are deprived "of their rights under the laws of this state pertaining to occupational diseases" unless such employee or employees file a written notice of rejection with the commission and the employer in the time and in the manner provided in the act. These provisions are consistent with § 287.120(1, 2). In this case it is undisputed that the employer and employee were operating under the provisions of the act.

■ The meaning of the terms "injury" and "accident" as used in the Workmen's Compensation Act have been broadened and made applicable to occupational diseases as a result of the 1931 amendment. Staples v. A. P. Green Fire Brick Company, Mo., 307 S.W.2d 457, 461–462 [4]. Complete or partial loss of hearing is one of the losses covered by § 287.190 and if claimant's impairment was caused by occupational disease it is compensable.

■ The purpose of the act is to render more certain the employee's compensation in case of an industrial accident or occupational disease, even though limited in amount. As stated in Kemper v. Gluck, 327 Mo. 733, 39 S.W.2d 330, 334 [9]: "The employer and employee may elect to acquiesce in the control of the act or reject it. By accepting it the provisions of the act become a part of the contract of employment. * * *. It is of the same character as a contract to arbitrate the differences between the employer and the employee. The waiver of certain defenses which an employer may have to an action for damages, against the waiver by the employee of a jury trial and agreeing to certain limited rates of compensation for in-

juries incurred in the service, are the balancing considerations for the agreement."

■ The compensation act, including the occupational disease amendment where applicable, is not supplemental or declaratory of any existing rule, right or remedy, but creates an entirely new right or remedy and where the employer and employee have elected to accept the provisions of the act such new right or remedy is wholly substitutional in character and supplants all other rights and remedies, at common law or otherwise. § 287.120; De May v. Liberty Foundry Co., 327 Mo. 495, 37 S.W.2d 640, 645 [1]; Cleveland v. Laclede-Christy Clay Products Co., Mo.App., 113 S.W.2d 1065, 1071 [7].

■ In order to effectuate its purpose, the act must be liberally construed in favor of the employee. Schulz v. Great Atlantic & Pacific Tea Co., 331 Mo. 616, 56 S.W.2d 126; Elsas v. Montgomery Elevator Co., 330 S.W. 596, 50 S.W.2d 130.

■ While the Missouri Workmen's Compensation Act does not define occupational diseases, certain standards appear in the Occupational Diseases Act, §§ 292.-300–292.440. Consistent therewith the term "occupational disease" has acquired by judicial construction a well-established meaning in this state. This definition and its basis is well-stated in Sanford v. Valier-Spies Milling Co., Mo.App., 235 S.W.2d 92, 95 [1] as follows: "Our act neither defines an occupational disease, nor does it designate any specific diseases as being occupational in character. In this situation the term is to be regarded as having been employed in its ordinary and customary sense, that is, as referring to a disease which is the natural incident or result of a particular employment and is peculiar to it, usually developing gradually from the effects of long continued work at the employment, and serving, because of its known relation to the employment, to attach to the employment a risk or hazard which distinguishes it from the ordinary run of

occupations and is in excess of that attending employments in general. Tindall v. Marshall's U. S. Auto Supply Co., 348 Mo. 1189, 159 S.W.2d 302; Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S.W.2d 323; Evans v. Chevrolet Motor Co., 232 Mo.App. 927, 105 S.W.2d 1081; Row v. Cape Girardeau Foundry Co., Mo. App., 141 S.W.2d 113; Renfro v. Pittsburgh Plate Glass Co., 235 Mo.App. 226, 130 S.W.2d 165; Vogt v. Lambert Pharmacal Co., Mo.App., 218 S.W.2d 788." See also Urie v. Thompson, 352 Mo. 211, 176 S.W.2d 471, 476 [13]; State ex rel. Fisher Body St. Louis Co. v. Shain, 345 Mo. 962, 137 S.W.2d 546, and 99 C.J.S. Workmen's Compensation § 169, p. 559.

The first two sections of the Occupational Diseases Act are as follows:

"292.300. Employer to provide protection to employees from diseases. That every employer of labor in this state engaged in carrying on any work, trade or process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or disease incident to such work, trade or process, to which employees are exposed, shall for the protection of all employees engaged in such work, trade or process, adopt and provide approved and effective devices, means or methods for the prevention of such industrial or occupational diseases as are incident to such work, trade or process. (R.S.1939, § 10211)"

"292.310. Articles considered dangerous to health. The carrying on of any process, or manufacture, or labor in this state in which antimony, arsenic, brass, copper, lead, mercury, phosphorus, zinc, their alloys or salts or any poisonous chemicals, minerals, acids, fumes, vapors, gases, or other substances, are generated or used, employed or handled by the employees in harmful quantities, or under harmful conditions, or come in contact with in a harmful way, are hereby declared to be especially dangerous to the health of the employees. (R.S.1939, § 10212)"

The appellants' contention that § 292.310 is determinative of the extent of coverage would ignore and give no effect to § 292.300. However, in determining the intent and meaning of the term "occupational disease" as used in the Workmen's Compensation Act, the words must be considered in their context and sections of the statutes in pari materia, as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words. State ex rel. Wright v. Carter, Mo.Sup., 319 S.W.2d 596; State ex rel. McKittrick v. Carolene Products Co., 346 Mo. 1049, 144 S.W.2d 153, 156 [4]; State ex rel. Major v. Ryan, 232 Mo. 77, 133 S.W. 8, 14 [2].

Section 292.320, relating to the furnishing of clothing and respirators to employees who work in industries productive of noxious and poisonous dust, refers to "every employer in this state to which sections 292.300 to 292.440 applies." It is true that the following eight sections, 292.330–292.400, have particular reference to § 292.310; however, the concluding four sections, dealing with the duty of the director of the division of industrial inspection, notices required to be posted, the penalty for violation, and the definition of the term employer, include § 292.300 to § 292.440 as well.

In discussing the Occupational Diseases Act, and particularly what is now § 292.-420, this court stated in Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S.W.2d 323, 333 [8]: "The General Assembly by that act intended, among many other things, to promote and disseminate a general knowledge of the dangers to the health of employees. It recognized that, in the course of years, such knowledge would grow and progress, even as the commercializing by industry of new discoveries of science would go forward. Every one knows that, since the enactment of that act there have been discovered many new processes of manufacture, subject to the act, which were unknown in 1913. It is also true that to-day there are known meth-

ods of protection from the dangers contemplated by the act which were not known in 1913. In our opinion, the word 'known,' as used in section 13264, in the phrases 'known dangers' and 'known means,' connotes dangers and means known at the time of the enactment of the act, and also known from time to time thereafter with the growth of knowledge of dangers and means, and with the development of industry creating new dangers and producing knowledge of new means of protection from dangers."

■ Our conclusion is that occupational diseases within the meaning of the compensation act are not limited to those caused by the chemicals and substances specifically mentioned in § 292.310. The items mentioned are "declared to be *especially* dangerous to the health of the employees" and they are given special treatment in succeeding sections. Section 292.300 is directed at "any work, trade or process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or disease incident to such work, trade or process" and provides that the employer, for the protection of his employees, shall adopt and provide effective devices "for the prevention of such industrial or occupational diseases." In an action at law prior to the 1931 amendment of the compensation act, this section was held to be "imperative" in its requirements and not too uncertain and lacking in definition to be valid and enforceable, the court stating: "In many statutes and ordinances, such words or similar words are used, and our courts have uniformly enforced such enactments." Boll v. Condie-Bray Glass & Paint Co., 321 Mo. 92, 11 S.W.2d 48, 53 [8]. We believe any occupational illness or disease reasonably comprehended within the terms of § 292.300 and the judicial definitions based thereon are within the purview of the 1931 amendment to the compensation act.

In support of their contention that the term occupational diseases was intended

to be limited to the "chemically toxic substances" mentioned in § 292.310, the appellants rely strongly upon Lockhart v. Kansas City, 351 Mo. 1218, 175 S.W.2d 814, 817, and the statement therein that the legislature recognized that "many chemical processes of modern industry were likely to cause occupational diseases." The question decided in the Lockhart case was the applicability of the Occupational Disease statutes to municipal corporations and the fact that chemicals used in water purification were involved in that particular case furnishes no authority for the contention that § 292.310 is preclusive.

The appellants further say that the claimant's impaired hearing does not fall within any recognized definition of disease. They cite us to Webster's New International Unabridged Dictionary, Second Edition, p. 746, and this definition: "A condition in which bodily health is seriously attacked, deranged, or impaired; sickness; illness; as, mortality from *disease;* a particular form or instance of such condition; a malady; an ailment; as infectious *diseases.*"

Dorland's Medical Dictionary, 23d Edition, p. 393, defines "disease" as follows: "A definite morbid process having a characteristic train of symptoms; it may affect the whole body or any of its parts, and its etiology, pathology, and prognosis may be known or unknown."

If the legislative intent and purpose is clearly otherwise, the term occupational disease does not have to conform to logical standards or other recognized definitions. Apart from this, however, we believe the evidence establishes claimant's condition as a result of a disease as that term is intended and commonly understood with respect to bodily impairments incidental and peculiar to occupations.

Accident, disease and injury are sometimes closely related and a particular episode may have elements of each. This is well-illustrated by the statement of Judge Cardozo in Connelly v. Hunt Furniture

Co., 240 N.Y. 83, 147 N.E. 366, 367–368, 39 A.L.R. 867: "We attempt no scientifically exact discrimination between accident and disease, or between disease and injury. None perhaps is possible, for the two concepts are not always exclusive, the one of the other, but often overlap. The tests to be applied are those of common understanding as revealed in common speech.

\* \* \* \* \* \*

"We make little progress when, viewing infection as an isolated concept, and ignoring its channels of attack or the manner of its coming, we say, upon the authority of science, that infection is a disease. It may be this, and yet an accident, too. This is distinctly recognized in section 48 of the statute, if it might otherwise be doubtful. Sunstroke, strictly speaking, is a disease, but the suddenness of its approach and its catastrophic nature have caused it to be classified as an accident. \* \*. Tuberculosis is a disease, yet, if it results from the sudden inhalation of poisonous fumes, it may also be an accident. \* \*. A like ruling has been made where some extreme and exceptional exposure has induced pneumonia or rheumatism. \* \*."

In Schneider's Workmen's Compensation Text, Volume I, Permanent Edition, p. 234, § 96, we find this statement of the growing unimportance of the distinction between accidents and occupational diseases: "The distinctions made by the courts between accidents and occupational diseases appear to be becoming more and more shadowy, probably as a result of the statutory admonition of liberal construction of the compensation acts which has prompted the courts to follow the rule that reasonable doubts as to the applicability of the act will be resolved in favor of coverage by the acts."

The testimony of the medical experts tended to establish that the pathology of concussive deafness is the destruction of the "end organs" or nerve endings in the cochlea, which is the recording mechanism of the inner ear. The deterioration or degeneration occurs first in the lowest turns of the cochlea and proceeds upward as the involvement increases. The degree of hearing destruction depends first upon a person's individual susceptibility, then on the intensity of the noise, and third upon the persistence of the noise. Where a person is in an enclosed space, all the vibrations are delivered to his ears and he is affected more than if he were in the open where the vibrations would be dissipated. Where the exposure to the noise is long continued, the impairment increases due to the progressive destruction of the nerve endings. Mr. Marie testified that in the course of his exposure to the noises he had "a ringing and cracking" in his ears.

The process of the disease is the destruction or degeneration of nerve ends in the cochlea. It is induced by the repetitive noises over a long period of time and the resulting injury and disability is the impairment of hearing. The pathology of "boilermaker's ear," as it was sometimes referred to in oral argument, is the same as that of Meniere's Disease and presbycusis, which is the lessening of the acuteness of hearing normally occurring in old age. Apparently it is not known to medical science whether the striking or beating of the repetitive sounds on the organs of the ear over a long period of time sets up a destructive infection or precisely what it is that causes the deterioration of the nerve ends in the cochlea. However, the etiology or cause of a disease is not necessary in order for it to be classified as such.

In Evans v. Chevrolet Motor Co., 232 Mo.App., 927, 105 S.W.2d 1081, 1084, the claimant, in the course of his work over a period of ten months, was subjected to the inhalation of soap spray which so irritated the lung tissues that tuberculosis developed and myocarditis became a contributing factor to his permanent total disability. The St. Louis Court of Appeals held that Evans must be regarded as suffering from an occupational disease since "the natural consequence of his employment was to set up chronic inflammatory processes in his respiratory system, and thereby to render the

same particularly susceptible to the growth and development of the tubercular bacilli." 105 S.W.2d 1084 [5]. See also King v. Monsanto Chemical Company, 8 Cir., 256 F. 2d 812, where it was held that cancer of the urinary tract resulting from the employee being exposed to harmful chemicals was an occupational disease within the 1931 amendment to the Missouri Workmen's Compensation Act.

Many of the Workmen's Compensation Acts of other jurisdictions contain provisions for compensating injuries resulting from occupational disease; however, the coverage varies from a specified number to all occupational diseases depending on the particular state statutes. Schneider's Workmen's Compensation Text, Volume III, Permanent Edition, p. 497, § 924. The respondent-claimant has cited three cases from other states in which awards were made for noise-induced impairments of hearing on the theory that occupational disease was causative. In Green Bay Drop Forge Co. v. Industrial Commission, 265 Wis. 38, 60 N.W.2d 409, 61 N.W.2d 847, the employee had worked for several years in a drop forge department where he was subjected to excessive continuous noises caused by hammers. In Slawinski v. J. H. Williams & Co., 298 N.Y. 546, 81 N.E.2d 93, the claimant had worked in a forge shop where he was subjected to a great volume of noise. In Rosati v. Despatch Shops, Inc., 298 N.Y. 813, 83 N.E.2d 860, the claimant was a riveter. Because of the difference in statutes, the chief value of these cases is to show an existing concept that a noise-induced hearing loss may be the result of an occupational disease.

■ Under the applicable statutes and the evidence in the case, we hold that the Industrial Commission did not act in excess of its powers in finding that the claimant had sustained a compensable injury as the result of an occupational disease.

Appellants' final contention is that the commission's finding that the onset of the occupational disease was "on or before December 1, 1952," is not supported by competent and substantial evidence. This is presented in connection with the further contention that the evidence shows the claim to be barred by the one year statute of limitations. Section 287.430.

■ The award does state that there was an occupational disease "on or *before* December 1, 1952." However, the additional findings of fact and conclusions of law, in the second paragraph, states that the claimant sustained the occupational disease "on or *about* December 1, 1952," and in the fifth paragraph we have the specific finding "that the claim for compensation was filed within the time prescribed by law for the reason that employee's alleged hearing loss was not reasonably discoverable or compensable until on or *about* December 1, 1952." (Emphasis added.) We believe this record, fairly and reasonably construed, precludes any possibility that the commission may have found that the claim accrued more than one year prior to its filing. The necessarily indefinite language "before" or "about" is circumscribed and limited by the specific finding that the claim for compensation was filed "within the time prescribed by law." In other words, the commission found that the injury became compensable as well as discoverable within one year prior to October 27, 1953, the date of filing the claim. We do not deem this to be an equivocal finding, violative of the standards announced in Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W. 2d 136, 142, upon which the appellants rely.

There was evidence tending to prove that the claimant became concerned about his hearing in November, 1949, that he talked to the company nurse about it and was examined by a physician, but it was not shown how much, if any, loss of hearing was found at that time. The doctor had no independent recollection and from his report could only say that Marie complained of a loss of hearing in his right ear. The doctor did not treat the claim-

ant; he only examined him on one occasion.

Apparently the first thorough examinations were given the claimant by Doctor Morris B. Simpson on November 22 and 28, 1952. An audiometer was used as well as other testing devices and methods and the doctor concluded there was a hearing loss of sixty per cent in the right ear and seventy-five per cent in the left ear and that it was attributable to the claimant's work. The claimant was further examined by Dr. Luther M. Callaway on October 27, 1953, and filed his claim on the same day. The claimant was vague and uncertain as to dates and other matters in his testimony, but his statements are not such as to constitute admissions conclusive of the issue of limitations.

 In Ford v. American Brake Shoe Co., Mo.App., 252 S.W.2d 649, 651 [1], the rule for fixing the time when the statute begins to run in this type of case was stated as follows: "In fixing the time of injury within the contemplation of the statute, the rule is that the limitation period begins to run whenever it becomes reasonably discoverable and apparent that a compensable injury has been sustained, which, in the case of an occupational disease, is the time when the disease has produced a compensable disability."

To the same effect this court said in Staples v. A. P. Green Fire Brick Company, Mo.App., 307 S.W.2d 457, 461 [2], an occupational disease case, that: "the 'injury' from which the time for filing claims begins to run (§ 287.430) occurs when it becomes reasonably discoverable and apparent that a compensable injury has been sustained."

The appellants earnestly insist that the evidence is too indefinite and is such as to permit an occupational disease claimant "to select at random a date within a year prior to filing his claim." In the very nature of things the incipience and progress of an occupational disease cannot be pin-pointed as in the case of an accidental injury.

However, the problem is of the same sort encountered when such actions are tried before a jury which can still be done absent an election by the employer to come under the provisions of the act. See Urie v. Thompson, 352 Mo. 211, 176 S.W.2d 471, 476 [13].

The evidence in the record is not conclusive that claimant's "compensable injury" was reasonably discoverable prior to the examination and findings by Dr. Simpson in November, 1952. Upon consideration of all of the evidence before it the commission could reasonably have made its finding and reached the result it did; hence, the reviewing court may not substitute its judgment on the evidence for that of the commission. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55, 62 [2]; Brown v. Douglas Candy Company, Mo.App., 277 S.W.2d 657, 664 [10].

Appellants' assignments of error are denied and the judgment is affirmed.

All concur.