Clinton Renfro, Employee, Respondent, v. Pittsburgh Plate Glass Company, Employer, Self-Insurer, Appellant.—130 S. W. (2d) 165.

St. Louis Court of Appeals. Opinion filed June 28, 1939.

*Everett Paul Griffin* for appellant.

228

*Everett Hullverson* and *T. J. Crowder* for respondent.

McCULLEN, J.—This is an appeal by the employer, self-insurer, from a judgment of the Circuit Court of Washington County, Missouri, affirming a final award of the Missouri Workmen's Compensation Commission in favor of the employee, respondent.

The claim for compensation was filed by the employee on September 1, 1937, and alleged that he suffered an injury to "both lungs—silicosis—occupational disease" while working for the employer. It alleged that the employee's disability began on January 4, 1937, and stated "both lungs affected—unable to peform any work, and condition permanent." The average weekly wages of the employee were stated as $32.42.

On September 3, 1937, the employer filed an answer to the claim, in which it denied that the average weekly wages of the employee were $32.42; denied that any disability began on January 4, 1937, and alleged that disability began on January 30, 1937; alleged that it was impossible at that time to determine whether or not the employee was permanently disabled, and therefore denied disability. The defense of the Statute of Limitations was raised by the employer first at the hearing before a member of the commission, and later before the full Workmen's Compensation Commission as to any injury occurring more than six months prior to January 4, 1937, or January 30, 1937.

The original hearing was held before a member of the Workmen's Compensation Commission, who, on February 17, 1938, made his award and findings of fact. The award was for permanent total disability, allowing the sum of $20 per week for three hundred weeks, and thereafter the sum of $7.60 per week for life, said payments to begin as of January 4, 1937, subject to a credit of $644.63 previously paid the employee up to December 12, 1937. The commissioner also, on said date, filed an "Additional Findings of Fact and Rulings of Law" as follows:

"The chief point in dispute is as to the wage upon which compensation shall be based. Employee is suffering from silicosis, and as he continued to work until January 4, 1937, it is employer's contention that compensation shall be based upon his wages for the

year preceding January 30, 1937, the date they contend disability began as a result of the silicosis.

"It is my opinion from the evidence that employee had sustained the injury or disease, which ultimately resulted in his disability, in December, 1935, when he was transferred from the pot house. This being true, I further find that his wages must be determined as per his earnings during 1935, rather than his earnings subsequent to that time. Section 3320 (a), which is the applicable part of the law, sets 'the year next preceding the injury' as the determining factor. Even though employee had no actual knowledge of the exact nature of the disease until his disability began, the injury or disease was contracted on or before December, 1935.

"Employee's earnings for 1935 were $1,581.91, and his average weekly wage is $30.41.

"I further find that compensation shall begin as of January 4, 1937, the date disability began as a result of the occupational disease."

In due time the employer filed an application for review and permission to argue the case orally before the full commission, which were granted. After a hearing by the full commission, that tribunal modified the award of the commissioner by holding that it was subject to an attorney's fee of $500 in favor of Everett Hullverson, attorney for employee, same to be a lien on the compensation payable, and as so modified the award was affirmed.

The employer duly appealed the case to the circuit court where the award of the commission was affirmed, after which the employer brought the case to this court by appeal.

It is admitted that the employee is now suffering from the disease known as silicosis, and has been suffering from that disease since January 3, 1937; that he is totally and permanently disabled; that said disease was contracted by the employee while he was working for the employer, and that it arose out of and in the course of his employment.

The employer contends that the award of the commission is not supported by competent evidence; that the facts found by the commission do not support the award; and that the findings of the commission are contradictory.

The employer asserts that, if the employee sustained a compensable injury on December 7, 1935, as found by the commission his claim filed September 1, 1937, is barred by the Statute of Limitations, and therefore the commission had no jurisdiction to hear and determine the case. That point is not pressed, however, because the employer states that the real question to be determined is: When did the employee in this occupational disease case sustain a compensable injury? The employer, although admitting that the employee is totally and permanently disabled as the result of silicosis contracted while working in its employ, contends that the award should begin with Janu-

ary 30, 1937, the date the employee's disability began; and that the rate of weekly compensation should be $14.94 based upon the employee's earnings for the year next preceding January 30, 1937, the date when he became totally disabled. It is not disputed that the employee's average weekly earnings during the year next preceding January 3 or January 30, 1937, were $22.41, which would give a compensation rate of $14.94 per week. It is also undisputed that the average weekly earnings of the employee during the year next preceding December 7, 1935, were $30.41, giving a weekly compensation rate of $20.

The commission computed its award upon the earnings of the employee during the year next preceding December 7, 1935, and ordered said award to begin as of January 4, 1937, based upon the view that, on January 4, 1937, the employee was suffering from silicosis and bronchial pneumonia; and that he was at least partially disabled on December 7, 1935.

It appears from the record that the employee began working for the employer in 1917, and continued in such employment until 1929. During that twelve-year period the employee worked in what is called the "pot house" in the employer's plant at Crystal City, Missouri. It is not disputed that there was much silica dust in the pot house during all the time that the employee worked there, due to the nature of the work there carried on.

After leaving such employment in 1929, the employee, during the next four years, was in business for himself doing truck work hauling gravel, and farm work, and was therefore in the open air where there was no silica or other noxious dust. On August 8, 1933, he was re-employed by the employer, but before he went to work the employer had Dr. John T. Rutledge, who was then in its employ as a physician examining employees, make a physical examination of the employee. Dr. Rutledge, called as a witness for the employee, testified that the physical examination of the employee made in August, 1933, showed silicosis and tuberculosis, but the doctor did not consider the employee disabled then. The doctor testified that he reported the result of that examination to the employer but did not inform the employee of his condition. The employee was at that time, August, 1933, put to work in the pot house, and continued to work there until December 7, 1935, when he was changed to what is known as the du-plate department, and still later was put at doing yard work. On March 3, 1935, Dr. Rutledge made another examination of the employee on behalf of the employer, which showed the same condition as before, with slight aggravation. A further examination was made of the employee by Dr. Rutledge on behalf of the employer on August 25, 1935, which showed a slight aggravation and "more increase of silicosis." On March 28, 1936, another examination of the employee was made by Dr. Rutledge, which "showed still further pro-

gression of his condition." The doctor testified, with respect to said examination, and referring to silicosis: "By that time it was getting in the so-called second stage, when a man begins to get a shortness of breath; that is as I remembered he had." On October 30, 1936, Dr. Rutledge made another examination of the employee, and found that there was still further progression of the disease and showed a well-marked second stage of silicosis. That was the last examination of the employee made by Dr. Rutledge during the time Dr. Rutledge was connected with the employer as an examining physician.

After each of said physical examinations, Dr. Rutledge made a report thereof to the employer showing the employee's condition, but did not inform the employee that he had silicosis, tuberculosis, or any other disease. The examinations by Dr. Rutledge were made at the request of James E. Jennings, who was during that period the employer's safety inspector. It is not disputed that Dr. Rutledge and Mr. Jennings, who were then both employed by the employer, knew of the employee's condition, and that they had classified him as having silicosis, but did not inform the employee of said condition.

The evidence shows that, on December 7, 1935, the employee was transferred from the pot house to work which the employee described as "in the du-plate, grinding glass." According to the employee's testimony, there was "an awful lot of dust in the pot house and not much in the other job." It also appears from the evidence that the transfer of the employee from the pot house to the du-plate work resulted in a reduction in the employee's earnings. The employee testified that he received no medical attention at any time until after he got down in bed on the 3rd of January, 1937. When asked when he began to notice the ill effects of the disease or condition he was in, he answered:

"I got kind of short-winded a year or so before they took me out of the pot house."

He further testified:

"Q. Did you make any complaint about being short-winded? A. No, I was examined and I went according to their examination they was giving me; we figured their doctor ought to know whether a man was able to work.

"Q. Their doctor examined you before you were taken out of the pot house? A. Yes.

"Q. After their doctor examined you, you were taken out of the pot house? A. Right.

"Q. Your pay, however, was reduced? A. Yes, sir."

The employee testified that the last day he worked was January 3, 1937. On cross-examination, the employee testified that at the time he was transferred from the pot house in December, 1935, six or seven other men were transferred with him; that a few other men were laid off entirely at that time. The employee testified:

"Q. Some were laid off and you and some of the others were transferred to another department? A. Yes, sir.

"Q. That is because the work in the pot house became slack, didn't it? A. That is what they said.

"Q. You knew it became slack, didn't you? A. Certainly; they said that.

"Q. Didn't you know, Mr. Renfro, the work in the pot house was getting slack? A. Yes."

It appears from Dr. Rutledge's testimony that the employee was partially disabled in March, 1936, when he was in the second stage of silicosis. In this connection, on a question by the commissioner, the doctor testified:

"Q. When a man is in the second stage of silicosis, you say he is partially disabled? A. Yes, sir."

On further cross-examination, he testified:

"Q. If he keeps working he is not disabled? A. He isn't able to do as much work as before.

"Q. But if he keeps working and gets the same rate of pay that other men in his class get? A. I am only concerned with the physical ability of the men; he is not able to do as much work in the second stage of silicosis as before he contracted it."

Dr. Rutledge further testified that even if a man does the work he is required to do by the company and gets the same pay as other men in the same class, that wouldn't alter his physical condition. When asked by the commissioner if he remembered about March 28, 1936, when he found the employee in the second stage of silicosis, whether he ordered a different employment for him, Dr. Rutledge answered: "I didn't have authority to do that." And further testified:

"Comm. Lahey (Q.): Did you order him to be taken away from his employment? A. No, I just reported the condition I found."

Dr. Alfred Goldman, a graduate of Washington University, practicing his profession in St. Louis and connected with Barnes Hospital, testified, on behalf of the employee, that he saw the employee after he was admitted to Barnes Hospital on January 16, 1937; that the diagnosis of the employee's condition was bilateral silicosis and bronchial pneumonia; that bilateral silicosis is silicosis of both lungs; that the disease was at that time in the third or last stage; that the bronchial pneumonia was superimposed upon the silicosis; that, when the employee left the hospital on January 29, 1937, the bronchial pneumonia had cleared up but not the silicosis; that third degree silicosis is a permanent condition. The witness testified that, if there was a concentration of dust and the particles were very small, it would take a minimum of two years to produce silicosis; that in the average case of silicosis it takes anywhere from five to twenty years to produce it where the dust is not that high; that he did not know whether the employee had pneumonia as the result of the silicosis or not; that one

could not get silicosis from working on the outside where there is no concentration of dust; that silicosis is caused from breathing into the lungs minute particles of silica dust. The witness further testified that, if the employee's physical condition was such that he could do everything that he was able to do before, and that if his vital capacity was just as great, then he was not injured and could keep on working. At that point Dr. Goldman testified:

"Q. If he was disabled from work, then you would say certainly from that date on he was injured, from the date he was disabled from doing his work, if he was injured then? A. If I might say this, to be fair: A man may work, be partially disabled and yet force himself to do certain things; he perhaps has no business working; just as patients with tuberculosis, he can go on for three, four or five years and work, we know he is totally disabled and as the patient continues to work on he hurts himself; if you tell me that man is healthy, at that time and is not hurting himself by working, then he is able to continue to work."

The witness was asked whether it was possible for a man to breathe in dust and get a fibrotic condition in the lungs and leave that work and go into some other work where he wouldn't breathe that dust, and continue "in a useful manner to society," and answered:

"We always take a man that has silicosis off that work and if he is in condition so he doesn't continue to get further exposure, further fibrosis, if he didn't have disability at that time, he could go into some other work.

"Q. It is not necessarily disabling? A. Depending on the stage of the silicosis."

Leon McClain, keeper of the records of the men employed by the employer, testified that the employee was transferred from the pot house to the du-plate department on December 7, 1935, the reason for the transfer being that the force at the pot house was reduced at that time; that thirteen men were transferred from the pot house to the du-plate department, and seven men were laid off without any work at all; that the reason for the transfer was that the casting house, where the glass manufactured by the employer is melted in pots in the furnaces, ceased operation and was closed up at that time; that the employer shortly before had begun to manufacture glass through the tank system in which no pots are used; that no men were transferred from the pot house because an examination had shown they were suffering from silicosis; that during the time the employee was in the du-plate department, he worked at least six hours a day for six full days during the week; that the employee worked continually from the time he was transferred from the pot house on December 7, 1935, up to January 4, 1937, when he contracted bronchial pneumonia.

James E. Jennings, the employer's safety inspector, testified that he handled Workmen's Compensation matters at the employer's

plant and reported all accidents to the commission; that he knew the employee, and that the employee never at any time made any claim to him for compensation or payments because of disability prior to January 3, 1937, nor did he ever claim that he was unable to work or was suffering from any disability; that such a claim, if made, would come to him. The witness testified in detail concerning the wages received by the employee at various times during the period of his employment, but since there is no dispute as to the figures it is unnecessary to set forth such testimony here.

It appears from the evidence that the employer made payments to the employee under a temporary agreement signed by both parties on March 11, 1937, which provided that such payments should not be considered as an admission of liability. These payments were made as for an injury occurring on January 30, 1937, and at a rate as of that date, and were being made twice every month up to the time of the hearing.

It is admitted by the employee that he continued to work up until January 3, 1937, but he nevertheless contends that the award should be based upon his earnings for the year next preceding December 7, 1935, because the evidence shows that on the last-named date he had silicosis which was admittedly contracted in the pot house of the employer, and on which date the employer transferred him from the pot house to work in the open, which was less remunerative, his wages being materially reduced.

The employer contends that the award should begin as of January 30, 1937, instead of January 4, 1937, because the employee on January 4, 1937, was not suffering from silicosis alone but was suffering from pneumonia, of which he was not cured until January 29, 1937. The employer concedes, however, that the compensation rate based upon the earnings of the employee in the year next preceding either January 4, 1937, or January 30, 1937, would be the same.

It will be noted that the findings of fact made by the commissioner and affirmed by the full commission specifically states: "I further find that compensation shall begin as of January 4, 1937, the date the disability began as a result of the occupational disease." Notwithstanding such a specific finding, which is supported by all the evidence, the award, which it must be remembered is for permanent total disability, bases the rate of compensation upon the employee's earnings in the year preceding December 7, 1935. The award, therefore, is not only contradictory of the specific finding of fact, but there is no evidence whatsoever of permanent total disability as of December 7, 1935. The employee does not even contend that there was more than partial disability at that time, even though he did not know it. The commissioner, in his findings of fact, stated that it was his opinion that the employee sustained the injury or disease in December, 1935, when he was transferred from the pot house, which

disease ultimately resulted in his disability. The evidence shows without dispute that the employee, even though it be conceded that he may have been partially disabled in December, 1935, made no claim of any kind but continued working and earning the same as other workmen in his class until January, 1937.|

We do not wish to be understood as saying that a workman's claim for compensation should be denied, jeopardized, or cut down in an occupational disease case, or in any other case, because the true nature of the disease or injury was not known to him when first he was afflicted, nor do we say or hold that the fact that an employee continued to work and receive wages conclusively shows there was no disability. We are aware that men may and do from dire necessity, by superhuman efforts, and sometimes with the assistance of others, continue to do some kind of work and receive wages when they are actually physically disabled, without being held to have changed their true *status* of disability and without imperiling their right to compensation. This court so held in Kinyon v. Kinyon, 230 Mo. App. 623, 71 S. W. (2d) 78. However, the case at bar is nothing like the Kinyon case and the rule applied therein is not applicable here. In the case at bar we are merely holding, on the facts shown by the record herein, that the award is inconsistent with the specific findings of fact made by the commission, and that there is no evidence to support an award for permanent total disability as of December 7, 1935, which is the date adopted by the commission as the basis for fixing the rate of compensation for such permanent disability.

The applicable statute provides that "the compensation shall be computed on the basis of the annual earnings which the injured person received as salary, wages, or earnings if in the employment of the same employer continuously during the year next preceding the injury." [Section 3320 (a), R. S. Mo. 1929 (Mo. Stat. Anno., Section 3320 (a), p. 8258).]

It is true the employee was suffering from an injury in December, 1935, in that he was at that time afflicted with silicosis, but the commission itself found from the evidence, and the evidence supports the finding, that the employee suffered no disability until January 4, 1937. The commissioner states specifically, "I further find that compensation shall begin *as of January 4, 1937, the date disability began as a result of the occupational disease.*" (Italics ours.)

We are unable to perceive how it can logically or justly be held that there is a compensable injury in an occupational disease case until there is disability on the part of the employee which affects his earning power.

It has been held that the words "occupational disease," as used in the Workmen's Compensation Act, ordinarily mean a disease which is the natural incident or result of a particular employment, usually developing gradually from effects of long-continued work at such

employment, and serving, because of its known relation to the employment, to attach to it a hazard which distinguishes it from the ordinary run of occupations, and is in excess of that attending employments in general. [Evans v. Chevrolet Motor Co. (Mo. App.), 105 S. W. (2d) 1081, 1084, and cases cited therein.]

If we were to adopt the employee's view in the case at bar that the commission's award as for an injury in December, 1935, is correct, although there was no disability or loss of earning power until January, 1937, then a proper regard for the law would require us to hold that the employee's claim herein is barred by the six months Statute of Limitations because his claim was not filed until September 1, 1937. It is extremely important that we should not adopt a rule which would result in claims of employees being barred by the Statute of Limitations under such circumstances as appear in this case. We are of the opinion that the Statute of Limitations is not involved at all under the evidence herein because we are holding that the commission's award of compensation, based on an injury as of December, 1935, is incorrect. Such award as for permanent total disability contradicts the commission's own findings of fact that there was no disability until January 4, 1937, and is not supported by the evidence. Furthermore, the evidence shows that the employee's claim was filed well "within six months from the date of the last payment," as provided by Section 3337, Revised Statutes of Missouri, 1929 (Mo. Stat. Anno., sec. 3337, p. 8269).

It has been held that the purpose of a Workman's Compensation Act is not indemnity for any physical ailment, but for loss of earning power, disability to work. [Rialto Lead & Zinc Co. v. State Industrial Comm. (Okla.), 240 Pac. 96.]

The Workmen's Compensation Act, as it was originally passed in this State, expressly excluded occupational disease and covered accidental injuries only. The words "accident," "injury," and "personal injuries" were carefully defined in the original Act, but, of course, were not intended to apply to occupational disease in any form because such disease was specifically excluded from the operation of the Act. [Sec. 3305, R. S. Mo. 1929 (Mo. Stat. Anno., sec. 3305, pp. 8238, 8239).] In 1931 the Legislature amended the above section of the Act by providing that an employer could elect to come under the Act as to occupational diseases. The amendment, however, did not change the definitions contained in said section and did not define "occupational diseases." It is, therefore, the duty of the courts to determine and apply the meaning of the terms mentioned in the above section in connection with occupational disease cases, even though they were not originally intended to apply to such cases.

It has been held that an injury is not an accident but the result of an accident; and that the Statute of Limitations provided for in the compensation act does not begin to run until it becomes reasonably

discoverable and apparent that a compensable injury has been sustained. [Wheeler v. Missouri Pacific R. Co., 328 Mo. 888, 42 S. W. (2d) 579; Kostron v. American Packing Co., 227 Mo. App. 34, 45 S. W. (2d) 871. See also Bridges v. Fruin-Colnon Const. Co. (Mo. App.), 52 S. W. (2d) 582.]

The last above-cited cases were decided upon the law as it existed before the "occupational disease" amendment of 1931 was in force, but the rule they apply with respect to the time of the "injury" we think is applicable to an occupational disease case in the absence of a definition in the amendment of 1931 as to the "time of the injury" in that kind of a case. It is our duty to give the compensation act a liberal construction, and we believe the rule mentioned will be found to be more liberal and favorable to the employee in all occupational disease cases than any we can conceive. To move the time of the "injury" forward to an earlier date in such cases where, as here, the disability did not manifest itself for a long period after the disease had been contracted by the employee, would not only not be in accordance with a reasonable construction of the law, but would result in many employees' claims being barred by the Statute of Limitations because of their failure to discover such "injury" in time to file their claims. We think that the reasonable view as to the time of the "injury" in an occupational disease case is that time when the disease causes a compensable disability.

In North End Foundry Co. v. Industrial Comm., 258 N. W. 439, the Supreme Court of Wisconsin held that disability within the compensation act occurs when the employee is disabled by physical inability to perform work in the usual and customary way; and that, in the absence of such disability, the employee sustains no compensable injury even though the employment may have subjected him to exposure which contributed to ultimate disability from the occupational disease of silicosis.

In Marsh v. Industrial Accident Comm., 218 Cal. 338, 18 Pac. (2d) 933, the court, defining the term "injury" as used in the compensation law, held that it was to be "understood as connoting a compensable injury and is correlated to an incapacity or disability justifying a compensatory award."

In Acme Body Works v. Koepsel, 234 N. W. 756, and on rehearing 236 N. W. 378, the Supreme Court of Wisconsin said: "It is generally held under workmen's compensation acts that injury results when the right to compensation arises." And further: "The date of disability fixes the date of injury."

In Odanah Iron Co. v. Industrial Comm., 275 N. W. 634, the Supreme Court of Wisconsin held that, when an employee gives up his work because he is physically unable to perform it in the usual way due to an occupational disease as respects an award of compensation, that point of time in the progress of the occupational disease is

comparable to an accident which also prevents him from continuing to perform service. In that case the employee was totally disabled from silicosis and tuberculosis which he contracted while working in the employer's mine. The employee became incapacitated from performing work during a period of time when the mine was closed, although the employee was not discharged from employment. The court held that the employee was not entitled to an award based upon wages earned when the mine was working full time, but that the award should be based on the earnings when the employee became disabled and in the employment in which he was then engaged.

In DeFilippo's Case, 284 Mass. 531, 188 N. E. 245, which was a case involving the occupational disease called pneumoconiosis due to the constant inhalation of dust by the employee who was a stone cutter, the employee continued to work after contracting the disease, but on a particular date was forced to quit because of his condition. The court held that the employee became incapacitated when he was unable to work. In that case the court said: "Generally speaking, compensation is allowed only for impairment of earning capacity. [Federico's Case, 283 Mass. 430.]"

In a great number of cases decided by the Massachusetts courts, it has been held that "in cases of personal injuries through the gradual accumulation in the body of harmful foreign matter, a 'personal injury' occurs when the accumulation becomes so great as to cause incapacity for work and not before." [Johnson's Case, 217 Mass. 388, 391, 104 N. E. 735; O'Donnell's Case, 237 Mass. 164, 133 N. E. 621; Bergeron's Case, 243 Mass. 366, 137 N. E. 739.]

In Kimlark Rug Corporation v. Stansfield, 246 N. W. 424, the Supreme Court of Wisconsin held that an employee who contracted a skin disease while employed by the Kimlark Rug Corporation, but who suffered no disability until sometime after he left such employment, was not entitled to receive compensation therefor from such employer.

Counsel for the employee assert that it is futile to point to the conceded fact that the employee worked continuously from August, 1933, to January 3, 1937, because many persons perform manual labor when they really are not able to do so on account of some hidden disease or injury of which they may not be conscious at the time; that to be disabled one is not required to be absolutely helpless. We agree with that statement of principle, but not with the application of it to this case as contended for by the employee's counsel. The employee's counsel cite the cases of Farmer v. Metropolitan Life Ins. Co., 85 S. W. (2d) 235; White v. Metropolitan Life Ins. Co., 107 S. W. (2d) 957; Moss v. Metropolitan Life Ins. Co., 84 S. W. (2d) 395; and Stoner v. New York Life Ins. Co., 114 S. W. (2d) 167, in support of their argument. All the cases cited were against insurance companies on policies of insurance providing benefits for total disability.

Such cases constitute no authority for the holding contended for by employee's counsel in the case at bar. Those cases involved the construction of a contract of insurance in which the insurance companies had not paid and were refusing to pay anything to the claimant for total disability. The case at bar is a workmen's compensation case in which the employer concededly paid the employee the full amount of his wages at all times up to January, 1937, when the employee was forced to quit, and thereafter continued to pay him compensation on a temporary agreement. To affirm the award made by the commission in this case would be equivalent to holding that an employer must, in addition to the wages paid to the employee during the period under discussion, now pay him compensation as for an injury or condition which the commission specifically found did not disable him from earning such wages during that period.

The purpose of the compensation law is to compensate an employee for a loss sustained by him due to injury or an occupational disease arising out of and in the course of his employment. The award of the commission herein requires payment on a basis not authorized by law under the evidence in the record, and is therefore erroneous.

It is argued on behalf of the employee in the case at bar that the employer changed the employee's work and transferred him from the pot house for the purpose of saving in the payment of compensation; that his wages were reduced from $30 per week to $20 per week solely for the purpose of retrenching in the amount of compensation which, under the law, the employer would soon thereafter be compelled to pay. It is asserted that such conduct on the part of the employer was a fraud upon the employee. If such a charge were shown by the evidence to be true, such conduct would not only be a fraud, it would be cruel and heartless. However, the record does not support such argument. The employee himself did not so testify. On the contrary, he testified on cross-examination that he knew that work in the pot house was getting slack at the time he was transferred. That testimony of the employee himself, coupled with his own further testimony that a number of other employees were transferred at that time from the pot house to another department, while still other employees were laid off entirely, leaves such argument without any justifiable basis in the record. Furthermore, the evidence shows that the employee's earnings were less in the year 1934 than they were in 1935, which, to say the least, does not sustain the contention made. If the employer intended to save on the rate of compensation, it would not have selected the year of higher wages to transfer the employee.

Upon the whole record, the award of the commission is contradictory of its finding that the employee's disability began on January 4, 1937, as a result of the occupational disease, and as so made is not supported by any competent evidence. The action of the circuit court in affirming such award was therefore erroneous.

The judgment of the circuit court is reversed and the cause remanded with directions to that court to remand the cause to the Workmen's Compensation Commission for further proceedings not inconsistent with the views expressed herein. *Hostetter, P. J.,* and *Becker, J.,* concur.