Michael **GARRONE**, Claimant/Respondent,

v.

The **TREASURER OF the STATE OF MISSOURI**, as Custodian of the Second Injury Fund, Additional Party/Appellant.

No. ED 83906.

Missouri Court of Appeals, Eastern District, Division Two.

Dec. 14, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 9, 2005.

Application for Transfer Denied April 5, 2005.

Rebecca K. Wright, Assistant Attorney General, St. Louis, MO, for appellant.

Robert J. Lenze, Robert J. Lenze, P.C., St. Louis, MO, for respondent.

KATHIANNE KNAUP CRANE, Judge.

In this worker's compensation case, the Second Injury Fund (SIF) appeals from the award of the Labor and Industrial Relations Commission (Commission) finding SIF liability for permanent total disability. It considered claimant's left knee surgery in May, 1999, to be a disability that pre-existed his primary injury, carpal tunnel syndrome, which did not become disabling until December 1, 1999, the date of his carpal tunnel surgery, which was the first date claimant was unable to perform his ordinary work duties as a result of that disease. The SIF asserts that the Commission erred in determining December 1, 1999 to be the date of disability for the carpal tunnel syndrome, and that the Commission was precluded from making that determination because claimant had used an earlier date as the date of the "occupational disease" on both his claim form and his settlement stipulation with employer. It also contends that the permanent and total disability award was against the weight of the evidence because there was overwhelming evidence that claimant was employable in the open labor market. We affirm.

Claimant, Michael Garrone, who was born in 1940, was employed by SuperValu, Inc., (employer) and its predecessor for approximately 30 years, until June, 2000, as a grocery buyer, a position primarily involving computer entry work. On November 13, 1998, he saw his primary care physician, Stephen Sanders, M.D., with complaints of pain and numbness in his arms. Dr. Sanders diagnosed bilateral hand paresthesia consistent with carpal tunnel syndrome. Claimant began using splints. After undergoing a nerve conduction study, claimant reported the disease to employer. On the December 3, 1998 report form, claimant listed the date of injury as November 3, 1998.

Employer first sent claimant to Dr. George Dirkers, who saw claimant on December 14, 1998 and diagnosed bilateral carpal tunnel syndrome. He advised him of various treatment options. Claimant continued with splints. Employer then sent claimant to Robert Tucker, M.D., for an evaluation. Dr. Tucker saw claimant on January 12, 1999. He also found claimant's symptoms consistent with carpal tunnel syndrome and that his work was a significant contributing factor. Dr. Tucker recommended claimant continue splinting, which reduced claimant's symptoms. As a result, Dr. Tucker did not place any restrictions on claimant.

In the meantime, on April 19, 1999, claimant began treatment for an April 9 injury to his left knee. Over time, that injury resulted in several surgeries, including one in May, 1999.

Claimant's carpal tunnel symptoms subsequently returned, and, in October, 1999, Dr. Tucker recommended surgery, but advised that claimant could continue his regular job duties until surgery. Dr. Tucker performed the surgery on claimant's right arm on December 1, 1999 and on claimant's left arm on December 15, 1999. Claimant was restricted to left hand duty after the first surgery and was restricted from all work after the second surgery. This was the first time claimant missed work from the carpal tunnel disease. On December 28, 1999, Dr. Tucker allowed claimant to return to limited duty using a computer for data entry up to fifteen minutes per hour. On January 11, 2000, claimant was released to full duty. He continued with medical care until May 30, 2000, at which time he was rated. Claimant retired in June, 2000.

On August 16, 2000, claimant made a claim for compensation for injuries to his

left and right wrists from repetitive hand activities that caused carpal tunnel syndrome. In Box 3 of the claim form, labeled "DATE OF ACCIDENT/OCCUPATIONAL DISEASE," he entered "11/3/98." He made an SIF claim based on previous injuries suffered in an automobile accident in 1965.

On May 15, 2001, claimant entered into a Stipulation for Compromise Settlement with employer. Line 1 of that form recited that "on or about *11/3/98,* the above named EMPLOYEE, while in the employment of the above named employer, sustained an accidental injury/occupational disease...." Claimant and employer agreed to a compromise lump sum settlement based on approximate disability of 22.5% of the left hand and 15% of the right hand, with a 10% load factor. The ALJ ordered that the SIF claim would remain open.

After settling with employer, claimant amended his SIF claim for permanent partial disability benefits to a claim for permanent total disability benefits. The ALJ conducted a hearing to determine whether and to what extent the SIF was liable for benefits. The ALJ awarded claimant 29 weeks of permanent partial disability, but denied permanent total disability benefits. The ALJ found, as a subsequent injury, that claimant had injured his left knee in April, 1999, resulting in surgery on May 4, 1999. The ALJ determined that claimant stopped working as a result of the April 1999 left knee injury, and was not permanently disabled from his primary carpal tunnel injury or the 1965 pre-existing injury.

Claimant filed an application for review asserting that the ALJ erred as a matter of law in finding that his carpal tunnel syndrome disability date was the date of diagnosis and not the date it became disabling. He argued that the carpal tunnel syndrome did not become disabling until after his December 1999 surgery, and, as a result, his April 1999 left knee injury was a pre-existing condition.

On review, the Commission modified the decision of the ALJ. The Commission found that December 1, 1999, the date of claimant's first wrist surgery for carpal tunnel release, was the date of disability from the primary condition and should be used in determining SIF liability. The Commission found that claimant was permanently totally disabled from the carpal tunnel injury combined with the pre-existing 1965 injury and the pre-existing 1999 knee injury. It awarded claimant permanent total disability benefits from January 11, 2000. The SIF appeals.

### DISCUSSION

■ When a workers' compensation claim is appealed, we review only questions of law. Section 287.495.1 RSMo (2000). We can modify, reverse, remand for rehearing, or set aside awards based on factual determinations only on the grounds prescribed by statute: (1) that the Commission acted without or in excess of its powers; (2) that the award was procured by fraud; (3) that the facts found by the Commission do not support the award; or (4) that there was not sufficient competent evidence in the record to warrant the making of the award. *Id.* We review the Commission's award to determine whether the award is "supported by competent and substantial evidence upon the whole record." *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003).

■ We review decisions of the Commission which are clearly interpretations or applications of law for correctness without deference to the Commission's judgment. *West v. Posten Const. Co.,* 804 S.W.2d 743, 744 (Mo. banc 1991); *Harri-*

*son v. Harrison Turf Co.,* 908 S.W.2d 159, 161 (Mo.App.1995). Findings of ultimate facts reached through applications of rules of law, rather than by natural reasoning based on facts alone, are conclusions of law. *Merriman v. Ben Gutman Truck Service, Inc.,* 392 S.W.2d 292, 297 (Mo. 1965). We defer to the Commission on issues of fact, but review questions of law de novo. *Endicott v. Display Technologies, Inc.,* 77 S.W.3d 612, 615 (Mo. banc 2002). We defer to the Commission when it resolves issues concerning credibility and weight to be given to conflicting evidence. *Moriarty v. Treasurer of State of Missouri,* 141 S.W.3d 69, 72 (Mo.App. 2004).

## I. *Date Disease Became Compensable Injury*

■ For clarity we first address the SIF's second point, in which it contends that the Commission erred in finding that claimant sustained a compensable injury on December 1, 1999 because there was overwhelming evidence that claimant experienced some type of disability that was compensable on or about November 3, 1998.

■. An occupational disease does not become a compensable injury until the disease causes the employee to become disabled by affecting the employee's ability to perform his ordinary tasks and harming his earning ability. *Feltrop v. Eskens Drywall and Insulation,* 957 S.W.2d 408, 413 (Mo.App.1997); *Coloney v. Accurate Superior Scale Co.,* 952 S.W.2d 755, 759–60 (Mo.App.1997). An employee can be diagnosed with an occupational disease and experience symptoms of the disease prior to the time that it becomes disabling. *See Prater v. Thorngate Ltd.,* 761 S.W.2d 226, 228–29 (Mo.App.1988); *Enyard v. Consolidated Underwriters,* 390 S.W.2d 417, 429 (Mo.App.1965); *Renfro v. Pittsburgh Plate*

*Glass Co.,* 235 Mo.App. 226, 130 S.W.2d 165, 171 (1939).

In this case, claimant worked without restriction until his first surgery for carpal tunnel release on December 1, 1999. There was no evidence that claimant's earning ability was impaired prior to December 1, 1999. Accordingly, claimant did not suffer a compensable injury until that date. The Commission's finding that claimant's carpal tunnel syndrome did not become disabling until December 1, 1999, when he was first unable to perform his ordinary work duties, was supported by competent and substantial evidence on the whole record. It did not err in holding as a matter of law that claimant's prior knee injury was a pre-existing disability to the carpal tunnel syndrome. This point is denied.

## II. *Stipulation to Scope of Hearing*

We next address the SIF's first point, in which it asserts that the Commission erred in reaching the question of when claimant sustained a compensable injury, because the parties had stipulated that the only issue at the hearing was whether the SIF had liability and did not stipulate that the date of disability was an issue. In its argument under this point, the SIF argues that because 1) the employer's liability was settled pursuant to a claim form and stipulation that both listed the date of injury as November 3, 1998 and 2) the only issue in dispute was whether the primary and pre-existing conditions combined to create SIF liability, the Commission was bound by the November 3 date. This argument has no merit because the date of disability is an essential issue in the determination of SIF liability. Further, this argument confuses the date of exposure to or causation of occupational disease, which claimant and employer agreed was November 3, 1998, with the date of disability or compensable

injury, which is the relevant date in determining SIF liability.

■ We first consider the SIF's contention that the date of disability could not be addressed because the parties had stipulated that the only contested issue was the SIF's liability. In its final award allowing compensation, the Commission found that, inherent in the issue of SIF liability "is the date of every alleged disability whether pre, post, or primary." It further recited:

> The Fund is only liable for disabilities that pre-exist the date of the primary injury and in order to determine this liability the bright line date of the primary injury is the first essential date that must be established and this is an inherent issue in every Fund hearing.

■ When an SIF claim is made for permanent disability compensation, the claimant must provide evidence to support a finding, among other elements, that he or she had a pre-existing permanent "disability." *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 214 (Mo.App.1999). The disability must have existed at the time the work-related injury was sustained. *Id.* Thus, the existence of any pre-existing disability is necessarily included in the contested issue of SIF liability. In order to determine whether a disability pre-exists a disability from a primary injury, the date of disability from the primary injury must be established. In this case, as discussed in the prior section, the Commission determined this date to be December 1, 1999.

■ We next address the SIF's argument that the Commission was bound by the November 3, 1998 date as the date of disability because claimant inserted that date as the date of occupational disease on his claim form and stipulated with employer that he sustained an occupational disease on that date. We disagree that the

date inserted on these forms was the date of disability.

Box 3 on the claim form contains is titled "DATE OF ACCIDENT/OCCUPATIONAL DISEASE." "Accident" is statutorily defined, in part, as an event or series of events that produce "objective symptoms of an injury." Section 287.020.2 RSMo (2000). By asking for the date of an accident, the form clearly asks for the date of the event or series of events that produced the injury, in other words, a date of causation.

■ The same box is used for the date of an occupational disease. An "occupational disease" is statutorily defined, in part, as an "identifiable disease" that arises out of and in the course of employment. Section 287.067.1 RSMo (2000). Unlike an accidental injury that occurs on a particular date, an occupational disease develops and manifests itself over a period of time and is not caused by a single event. *Bull v. Excel Corp.*, 985 S.W.2d 411, 416 (Mo.App.1999). Although it is difficult to establish, the date of exposure to an occupational disease forms the basis for a determination of the employer's and insurer's liability. *Enyard*, 390 S.W.2d at 429. This concept is codified in Section 287.063.1 RSMo (2000) (presumption of exposure) and Sections 287.063.2 RSMo (2000) and 287.067.7 RSMo (2004 Supp.) (last exposure). *See also, Johnson v. Denton Const. Co.*, 911 S.W.2d 286, 288 (Mo. banc 1995); *Arbeiter v. National Super Markets, Inc.*, 990 S.W.2d 142, 145–46 (Mo. App.1999); *Bull*, 985 S.W.2d at 416.

■ The date of exposure is the date of causation. *Arbeiter*, 990 S.W.2d at 146. Thus, the critical date to be entered for an occupational disease in Box 3 on the claim form is the date of exposure. II Mo. Workers' Compensation Law Section 11.4, p. 11–10 (Mo. Bar 3rd Ed.2004).

Likewise, the date to be entered on line 1 of the Stipulation for Compromise Settlement for the date an occupational disease was sustained "while in the employment of" the employer against whom a claim is made, is the date of exposure. It is not the date of disability.

An employee can suffer an injurious exposure prior to becoming disabled. *Enyard,* 390 S.W.2d at 429. The injurious exposure does not become a compensable injury until it becomes disabling. *Id.* Because of this distinction, a stipulation to a date of compensable injury is not a stipulation to a date of exposure. *Bull,* 985 S.W.2d at 416–17. Likewise, a stipulation to a date of exposure is not a stipulation to a date of disability. By entering November 3, 1998 on Box 3 of the claim form and line 1 of the Stipulation for Compromise Settlement, claimant was entering a date of exposure and did not admit or stipulate to the date of disability.

This point is denied.

### III. *Different Date for SIF Liability*

For its third point the SIF contends that the Commission erred because it determined a different date for an occupational disease for SIF liability than the date used in the claim against employer. It argues that the Commission is required to use the same date of injury since the SIF claim arises out of the claim against employer. For the reasons set out in our discussion under points one and two, this argument has no merit. Point three is denied.

### IV. *Sufficiency of the Evidence*

As its fourth point, the SIF maintains that the overwhelming weight of the evidence demonstrates that claimant is not permanently and totally disabled, because he is employable in the open labor market. The SIF argues that claimant voluntarily retired and later worked two part-time, short-term jobs and that the SIF's vocational expert, June Blaine, had opined that claimant was employable.

"The test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment." *Sutton v. Vee Jay Cement Contracting Co.,* 37 S.W.3d 803, 811 (Mo.App.2000). The "pivotal question" is whether an employer can reasonably be expected to hire this employee, given his or her present physical condition, and reasonably expect the employee to successfully perform the work. *Id.*

Claimant testified that he retired because of the problems he had with his legs and hands. He testified that he obtained two temporary, part-time jobs after his retirement as a result of friendships with those employers, without completing an application. Dr. Volarich reported that, with respect to claimant's hands and arms, he was required to avoid repetitive gripping, pinching, squeezing, pushing, pulling, twisting, rotary motions, and similar tasks and avoid impact and vibratory trauma to the hands. He also restricted the weights claimant could handle. With respect to his legs, claimant was to avoid repetitive stooping, squatting, crawling, kneeling, and all impact maneuvers, and he was cautioned to use extra care in navigating steps, uneven surfaces, and ladders.

James Israel, a vocational rehabilitation counselor, testified that claimant was disabled from his usual occupation as a grocery buyer and from related occupations for which he would be qualified by education and experience. He explained that claimant was an older individual who did not have vocational skills that would translate to another occupation within his physical capacity and opined that claimant was unable to perform work within any classi-

fication as defined by the U.S. Department of Labor. He testified that because of claimant's diminished endurance capacity, it was unlikely claimant could sustain or find any substantial, gainful full-time employment. Mr. Israel added that the cumulative effects of claimant's physical condition, age of 62, education, work background, and the special work site accommodations required from prospective employers, "placed him at an insurmountable disadvantage" in obtaining employment. Mr. Israel testified that claimant was unable to resume substantial gainful activity as a result of his medical limitations. He concluded that claimant could not compete in the open labor market.

Reconciliation of conflicting evidence is a fact question for the Commission. The Commission's decision to believe Dr. Volarich, claimant, and Mr. Israel and not believe Ms. Blaine is well within its authority. *Johnson*, 911 S.W.2d at 288; *Chatmon v. St. Charles County Ambulance*, 55 S.W.3d 451, 457 (Mo.App.2001). Further, objective medical evidence supported claimant's testimony. On the whole record, the Commission could reasonably have found claimant to be totally disabled. Point four is denied.

The Commission's award is affirmed.

PATRICIA L. COHEN, P.J., and ROBERT G. DOWD, JR., J., concur.