

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

JAMES WICKAM, )
)
          Appellant-Respondent, )
)
vs. ) WD79188 (Consolidated with WD79211)
)
TREASURER OF THE STATE OF ) Opinion filed:  September 20, 2016
MISSOURI – CUSTODIAN OF THE )
SECOND INJURY FUND, )
)
          Respondent-Appellant, )

## APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

Before Division Three:  Victor C. Howard, Presiding Judge,
Lisa White Hardwick, Judge and Edward R. Ardini, Jr., Judge

James Wickam appeals and the Missouri State Treasurer as custodian of the Second Injury Fund ("SIF") cross appeals the Final Award of the Missouri Labor and Industrial Relations Commission ("Commission") finding SIF liability for permanent partial disability.  The Commission considered Mr. Wickam's right shoulder injury, sustained at work on August 17, 1999, to be a disability that pre-existed his primary injury, carpal tunnel syndrome, which did not become disabling until November 1, 2001.  The Commission found that the confluence of "(1) a diagnosis of clearly work-related repetitive trauma in the form of carpal tunnel syndrome; (2) clear clinical evidence of impairment in the form of numbness of the upper extremities; and (3) a need

for medical treatment in the form of carpal tunnel release surgery" shown in Mr. Wickam's expert's report of November 1, 2001, established a "compensable injury" as of that date.

Mr. Wickam asserts that the Commission erred in determining November 1, 2001 to be the date of disability for the carpal tunnel syndrome, arguing the date should be September 12, 2003, and December 22, 2003, because those dates were "when Mr. Wickam was no longer able to work due to his need for carpal tunnel surgery," which he argues is the proper test for when an injury becomes compensable for purposes of SIF liability. SIF also contends that the Commission erred in determining November 1, 2001 to be the date of disability for the carpal tunnel syndrome, but argues the date should be November 6, 2000, because Mr. Wickam "had numbness and tingling in his hands, was treated for these complaints and had confirmed disability with his hand at work as early as August and September, 1999, and received a diagnosis of carpal tunnel syndrome on November 6, 2000."

The judgment is reversed and remanded.

### Background

Mr. Wickam worked in truck driving and heavy equipment operation from the 1970s to April 18, 2003. During that time, he did work requiring repetitive motions of the upper extremities to continuously manipulate levers, gear shifts, and steering wheels. Mr. Wickam obtained these various jobs, which were sometimes short-term in nature, through his local union hall.

On August 17, 1999, while working for Republic Services, Mr. Wickam's earth mover got stuck and a push cab that was helping release the earth mover jerked and threw him as the machinery was freed, causing shoulder pain within a few days. Mr. Wickam consulted Dr. Craig Satterlee for treatment of his shoulder injury, and in his report, Dr. Satterlee noted Mr. Wickam's complaints of numbness in the right hand and ordered an EMG to rule out a brachial plexus injury.

2

The EMG, performed November 6, 2000, revealed moderate to severe carpal tunnel syndrome in Mr. Wickam's right upper extremity.

Mr. Wickam's medical expert, Dr. P. Brent Koprivica, evaluated Mr. Wickam on November 1, 2001, for the 1999 right shoulder injury, and also examined his bilateral upper extremities. Dr. Koprivica's report noted the November 2000 EMG and opined that Mr. Wickam was suffering from bilateral carpal tunnel syndrome, that his activities as a heavy equipment operator were a substantial factor in causing the condition to develop, and that he needed further electrodiagnostic studies and treatment in the form of surgical decompression of both upper extremities.

On September 12, 2003, Dr. Leslie Thomas performed right carpal tunnel release surgery on Mr. Wickam. On September 24, 2003, an EMG revealed that Mr. Wickam also had moderately severe left carpal tunnel syndrome. Dr. Thomas performed left carpal tunnel release surgery on Mr. Wickam on December 22, 2003. On September 29, 2004, Dr. Thomas determined that Mr. Wickam had reached maximum medical improvement, and rated each upper extremity as having a generalized 5% residual deficit. Mr. Wickam settled his claim against Republic Services for the primary injury of carpal tunnel syndrome consistent with a rating of 18% permanent partial disability ("PPD") affecting the body as a whole.

Dr. Koprivica issued another report on Mr. Wickam on October 12, 2004, in which he reiterated his opinion that Mr. Wickam suffered at least moderately severe bilateral carpal tunnel syndrome as a result of his work activities operating heavy equipment and driving trucks. Dr. Koprivica again opined that these activities were a substantial factor in causing the bilateral carpal tunnel syndrome. The Commission found that Dr. Koprivica's causation opinion was not contradicted by any other expert medical opinion evidence and not inherently incredible, and

3

credited it as such, though deeming the 18% PPD rating from Mr. Wickam's settlement with Republic Services as appropriate for the carpal tunnel syndrome, rather than Dr. Koprivica's opinion of a 20% rating.

The Commission discussed Mr. Wickam's numerous preexisting conditions, beginning with the right shoulder injury sustained August 17, 1999, and treated by Dr. Bruce Scully from August to October 1999. Mr. Wickam was diagnosed with bursitis of the right shoulder and Dr. Scully restricted him from any work over shoulder height, prescribed medications and physical therapy, injected the right shoulder, and recommended range of motion and strengthening exercises.

As mentioned previously in connection with the background of Mr. Wickam's carpal tunnel, Mr. Wickam also saw Dr. Satterlee for additional treatment of his shoulder. Dr. Satterlee diagnosed a rotator cuff tear, recommended surgery, and performed a right total shoulder replacement on December 6, 2000. Dr. Satterlee released Mr. Wickam as having reached maximum medical improvement of the right shoulder on June 7, 2001, with a permanent lifting restriction of 50 pounds. The Commission found that Mr. Wickam's settlement of this claim against Republic Services for the shoulder injury to be persuasive evidence and thus found Mr. Wickam suffered a 50% PPD of the right shoulder as of June 7, 2001.

The Commission discussed testimony from Dr. Allan Schmidt, a PhD psychologist that Mr. Wickam suffers from attention deficit hyperactivity disorder (impulsive type) and a personality disorder (not otherwise specified and with obsessive-compulsive features) resulting in permanent partial psychological disability. The Commission found that Mr. Wickam's "disorganized and discursive" testimony, as well as his "similar presentation when evaluated by his vocational expert, Mary Titterington" provided significant support to Dr. Schmidt's diagnosis

4

based on his description of the symptoms resulting from those conditions. The Commission therefore deemed that Mr. Wickam suffered a preexisting psychological disability of 10% of the body as a whole, a condition that would have been present from early birth or childhood, and at the time of the primary injury.

The Commission also considered Mr. Wickam's claimed preexisting disability referable to sleep apnea. Mr. Wickam first sought evaluation and treatment for excessive fatigue and weight gain from Dr. Raghavendra Adiga on April 5, 1999, and a sleep study was ordered due to Dr. Adiga's impression that Mr. Wickam was most likely suffering from obstructive sleep apnea, among other possible conditions. Subsequent to this initial sleep study, Mr. Wickam did not follow up or seek additional treatment although his symptoms continued, and eventually bothered him at work. On May 1, 2003, Mr. Wickam consulted Dr. Lisa Mansur for his complaints of severe sleepiness, which he dealt with by sleeping on his lunch breaks and stopping to nap during his commute to and from work. Pursuant to Dr. Mansur's recommendation, Mr. Wickam submitted to another sleep study that showed extremely severe obstructive sleep apnea not adequately treated by CPAP or BiPAP.

Due to the severity of sleep apnea shown by Mr. Wickam's sleep study, Dr. Mansur recommended a tracheostomy, which was ultimately performed by Dr. Sidney Christiansen on June 3, 2003. Later, having had numerous complaints and problems with obstruction involving the tracheostomy, on January 5, 2004, Mr. Wickam underwent a stoma revision including additional examinations for problems with the tracheostomy and related obstruction. The Commission noted that Mr. Wickam testified that no employer would hire him to perform his previous work on construction sites due to the risk of dust and debris entering his tracheostomy

5

tube.  The Commission determined from this history that Mr. Wickam had disabling sleep apnea as of April 2003.

The Commission also analyzed Mr. Wickam's claim regarding preexisting disability referable to his knees, finding evidence sufficient to support a determination of such disability as of July 21, 2003, the date when Mr. Wickam first sought treatment for the condition, according to the medical records submitted at the hearing.  The Commission noted Mr. Wickam's testimony that he had suffered knee problems for 20 or 30 years, but not specifying a particular time they began, and that at some time these problems forced him to regularly use a milk crate to get into his machine at work, though he did not reveal this practice nor his condition to his employer for fear of being sent home.

Dr. Leslie Thomas saw Mr. Wickam for complaints of aches and pains in his knees on July 21, 2003, and after reviewing his subsequent x-ray and MRI, opined Mr. Wickam had a meniscal tear in his right knee and recommended arthroscopic surgery to correct it.  Dr. Thomas performed the surgery on Mr. Wickam's right knee on August 13, 2003.  On January 19, 2004, Dr. Thomas observed that Mr. Wickam had obvious retropatellar crepitance and recommended left knee arthroscopy which she then performed on February 5, 2004, along with medial meniscectomy and debridement indicated at that time.

The Commission analyzed the law on the date of injury by occupational disease, rejected the dates argued both by Mr. Wickam and by SIF, and decided that because Dr. Koprivica's report of November 1, 2001, "demonstrates: (1) a diagnosis of clearly work-related repetitive trauma in the form of carpal tunnel syndrome; (2) clear clinical evidence of impairment in the form of numbness of the upper extremities; and (3) a need for medical treatment in the form of carpal tunnel release surgery," that "the confluence of these facts established a 'compensable injury' as

6

of November 1, 2001."  Because of the date the Commission assigned to Mr. Wickam's bilateral carpal tunnel syndrome, it was not persuaded by Dr. Koprivica's opinion that Mr. Wickam's bilateral knee and sleep apnea conditions preexisted the primary injury of carpal tunnel syndrome, as Dr. Koprivica's opinion in that regard was based on his assumption that the appropriate date of the carpal tunnel syndrome injury was April of 2003.  For the same reason, the discrepancy in the date of the primary carpal tunnel injury, the Commission was not persuaded by Dr. Koprivica's and Mr. Wickam's vocational expert's opinions that Mr. Wickam was permanently and totally disabled based on a combination of the carpal tunnel syndrome injury and Mr. Wickam's preexisting conditions, which were also based upon including the subsequent disability referable to Mr. Wickam's bilateral knees and sleep apnea in reaching their ultimate opinions of permanent total disability.

One member of the Commission issued a dissenting opinion, concluding that Mr. Wickam's carpal tunnel syndrome became compensable for purposes of his SIF claim on September 12, 2003, the date of his first carpal tunnel release surgery, before which, there was no evidence that Mr. Wickam experienced any physical impairment referable to carpal tunnel syndrome that affected his ability to perform work tasks.  The dissenting member therefore concluded that Mr. Wickam's bilateral knee condition and sleep apnea should be included in the assessment of SIF liability for Mr. Wickam's preexisting conditions.

Mr. Wickam now appeals and SIF cross appeals.

**Standard of Review**

The standard of review for a decision by the Commission is set forth in section 287.495.1, which provides:

7

The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

"This Court's interpretation of the workers' compensation act is informed by the purpose of the act, which is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment." *Schoemehl v. Treasurer of State*, 217 S.W.3d 900, 901 (Mo. banc 2007). "Accordingly, the law 'shall be liberally construed with a view to the public welfare.'" *Id.* (quoting Section 287.800).[1] "Any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee." *Id.* "[W]e defer to the Commission on issues involving the credibility of witnesses and the weight to be given testimony, and we acknowledge that the Commission may decide a case 'upon its disbelief of uncontradicted and unimpeached testimony.'" *Alexander v. D.L. Sitton Motor Lines*, 851 S.W.2d 525, 527 (Mo. banc 1993) (quoting *Ricks v. H.K. Porter, Inc.*, 439 S.W.2d 164, 167 (Mo.1969)). Decisions of the Commission that are interpretations or applications of law are reviewed de novo for correctness, without deference to the Commission's judgment. *Garrone v. Treasurer of State of Mo.*, 157 S.W.3d 237, 241-42 (Mo. App. E.D. 2004).

---

[1] Section 287.800 RSMo was amended in 2005 to require strict construction of the Workers' Compensation Act. Neither party disputes that this case should be governed by the prior version of the statute since Mr. Wickam's injury preceded the amendments. *See also Lawson v. Ford Motor Co.*, 217 S.W.3d 345, 349 (Mo. App. E.D.2007) (concluding that 2005 amendments do not apply retroactively to injury pre-dating their enactment).

8

**Discussion**

The issue on appeal is whether the Commission erred in determining the date of injury to assign to Mr. Wickam's carpal tunnel syndrome for the specific purpose of assessing preexisting disability in the context of Mr. Wickam's claim against the SIF.

Section 287.220 establishes that the Second Injury Fund is liable in certain cases of permanent disability where there is a preexisting disability. The Second Injury Fund is responsible for the portion of disability attributable to the preexisting condition. *Gassen v. Lienbengood*, 134 S.W.3d 75, 79 (Mo. App. W.D. 2004). A claimant establishes Second Injury Fund liability by showing either that (1) the preexisting partial disability combined with a disability from a subsequent injury to create a permanent and total disability or that (2) the two disabilities combined result in a greater disability than that which would have occurred from the last injury alone. *Id.* Here, Mr. Wickam suffered the primary injury of bilateral carpal tunnel syndrome. The date of Mr. Wickam's carpal tunnel syndrome injury determines which of his numerous additional disabilities preexisted the carpal tunnel syndrome and for which the SIF would therefore be liable.

"An occupational disease does not become a compensable injury until the disease causes the employee to become disabled by affecting the employee's ability to perform his ordinary tasks and harming his earning ability." *Garrone*, 157 S.W.3d 237, 242 (citing *Feltrop v. Eskens Drywall & Insulation*, 957 S.W.2d 408, 413 (Mo. App. W.D. 1997); *Coloney v. Accurate Superior Scale Co.*, 952 S.W.2d 755, 759–60 (Mo. App. W.D. 1997)). It is possible for an employee to have experienced symptoms of and be diagnosed with an occupational disease before the time it becomes disabling and thus compensable. *Id.*

In *Garrone*, the employee worked for many years in a position primarily involving computer entry work. 157 S.W.3d at 240. He first complained of carpal tunnel symptoms of pain

and numbness in his arms on November 13, 1998, in a visit with his primary care doctor, who diagnosed bilateral hand paresthesia consistent with carpal tunnel syndrome. *Id.* The employee then began using splints. *Id.* After a nerve conduction study, the employee reported the disease to his employer, listing the date of injury as November 3, 1998, on the report form of December 3, 1998. *Id.* The employer then sent the employee to another doctor on December 14, 1998, who diagnosed bilateral carpal tunnel syndrome and advised various treatment options. *Id.* The employee continued using splints. *Id.* The employer had the employee see another doctor on January 12, 1999, who also found the employee's symptoms to be consistent with carpal tunnel syndrome and that his work was a significant contributing factor. *Id.* That doctor recommended continued splinting, which reduced the employee's symptoms, and did not place any restrictions on the employee. *Id.*

In April of 1999 the employee experienced a knee injury for which he was treated and ultimately underwent multiple surgeries, including one in May of 1999. *Id.* The employee's carpal tunnel symptoms subsequently returned, and in October of 1999, the doctor the employee had seen previously for carpal tunnel recommended surgery but advised that the employee could continue his regular job duties until surgery, which was performed on the employee's right arm on December 1, 1999 and on his left arm on December 15, 1999. *Id.* The employee was restricted to left hand duty after the first surgery and was restricted from all work after the second surgery, this representing the first time he missed work from the carpal tunnel disease. *Id.*

The *Garrone* Court concluded that, because there was no evidence that the employee's earning ability was impaired prior to December 1, 1999, and the employee worked without restriction until his first surgery on that date, the employee did not suffer a compensable injury until that date. *Id.* The Court concluded, therefore, that the Commission's finding that the

10

employee's carpal tunnel syndrome did not become disabling until December 1, 1999, when he was first unable to perform his ordinary work duties, was supported by competent and substantial evidence on the whole record and held as a matter of law that the employee's prior knee injury was a pre-existing disability to the carpal tunnel syndrome. *Id.* In so holding, the Court rejected the SIF's contention that the date of the employee's carpal tunnel injury should have been November 3, 1998, which was the date of injury the employee had first listed in his initial report to his employer. *Id.*

Here, Mr. Wickam also experienced symptoms and received a diagnosis of carpal tunnel long before there was evidence of it impairing his earning ability, by missing any work or by any of his evaluating or treating physicians restricting his work in connection with his carpal tunnel symptoms or diagnosis.

As a result of his shoulder injury of August 17, 1999, and related symptoms and treatment Mr. Wickam was restricted as to over the shoulder height work on the right, lifting, pushing, pulling with the right upper extremity from August 24, 1999 to October 7, 1999, when he received an injection in his injured shoulder, to which his symptoms responded positively for a time and he was placed back on full duty. His symptoms had returned and were worsening by November 1, 1999, and he was again restricted to light duty with no overhead duty and no lifting over 25 pounds. After consultation with multiple physicians, Mr. Wickam underwent right total shoulder replacement and distal clavicle excision, received follow up care, and was then released on June 7, 2001, when he was deemed to be at maximum medical improvement of his shoulder injury with a permanent 50-pound lifting restriction. In sum, any restrictions from approximately August 17, 1999, to June 7, 2001, were in connection with Mr. Wickam's shoulder injury and treatment.

11

Moreover, his 50-pound lifting restriction at release was permanent, and connected only to the shoulder injury and surgery, not carpal tunnel.

The first evidence that Mr. Wickam experienced any physical impairment referable to carpal tunnel syndrome that affected his ability to perform work tasks was his necessary inability to work during and following his first carpal tunnel release surgery on September 12, 2003. Mr. Wickam was not questioned at trial about whether and how much his carpal tunnel symptoms affected his work or ability to perform work-related tasks. Because there was no evidence that Mr. Wickam's earning ability was impaired prior to September 12, 2003,[2] and Mr. Wickam was capable of working without restriction[3] until his first surgery on that date, Mr. Wickam did not suffer a compensable injury until that date. *Garrone*, 157 S.W.3d at 240.[4]

Therefore, the Commission's finding that Mr. Wickam's carpal tunnel syndrome became a "compensable injury" as of November 1, 2001, when Dr. Koprivica issued a report demonstrating (1) carpal tunnel syndrome diagnosis, (2) clinical evidence of impairment in the form of carpal tunnel symptoms, and (3) a need for medical treatment, was an erroneous interpretation and application of the Workers' Compensation Law. As a result, the Commission's holding that Mr.

---

[2] An employer may not use this decision as grounds to deny an employee's repetitive trauma claim until surgery is required or until the employee misses work. As this Court explained in *Coloney v. Accurate Superior Scale Co.*, 952 S.W.2d 755, 758-61 (1997), overruled on other grounds by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 226 (Mo. banc 2003), other factors indicating loss of earning ability, such as limitations on the employee's ability to perform vocational tasks, must be considered in determining whether an employee with a repetitive trauma suffered a compensable injury for purposes of assessing employer liability under the Workers' Compensation Law.

[3] For guidance on the relationship between disability and compensability as affects the issue of post-2005 amendment notice protections afforded by section 287.420, see *Allcorn v. Tap Enterprises, Inc.*, 277 S.W.3d 823, 828-830 (Mo. App. S.D. 2009). As to its effects on the statute of limitations, see, e.g., *Lawrence v. Anheuser Busch Cos., Inc.*, 310 S.W.3d 248, 250-52 (Mo. App. E.D. 2010). For a discussion explaining the implications of the interaction between disability and compensability on the application of the last exposure rule, see, e.g., *Pierce v. BSC, Inc.*, 207 S.W.3d 619, 621-22 (Mo. banc 2006).

[4] It is unimportant that this date does not match the earlier date Mr. Wickam used in filling out Box 3 in his original claim form, which calls for the "Date of Accident/Occupational Disease," as the critical date to be entered for an occupational disease in Box 3 on the claim form is the date of exposure and causation, not that of the resultant injury or disability. *Garrone*, 157 S.W.3d at 243.

Wickam's sleep apnea[5] and disability referable to bilateral knee condition[6] were not pre-existing disabilities to the carpal tunnel syndrome was also a misapplication of the law.

Because Mr. Wickam's primary injury of carpal tunnel syndrome became a compensable injury on September 12, 2003, the disabilities of sleep apnea beginning in April of 2003 and a bilateral knee condition beginning July 21, 2003, constitute "previous disabilities" under section 287.220.1, RSMo 2000, and are therefore included in SIF's liability to Mr. Wickam.

The only medical and vocational expert opinion evidence on the record indicates that Mr. Wickam is permanently and totally disabled due to the combination of his primary injury of bilateral carpal tunnel syndrome and his preexisting conditions of right shoulder injury, psychological disability, sleep apnea, and bilateral knee condition. The Commission's decision indicates that the reason it did not award permanent total disability for Mr. Wickam's combination of conditions was "because both Dr. Koprivica and [Mr. Wickam's vocational expert] include the subsequent disability referable to [Mr. Wickam's] bilateral knees and sleep apnea in rendering their ultimate opinions regarding permanent total disability" and "Dr. Koprivica assumed the appropriate date of injury for purposes of assessing [Mr. Wickam's] preexisting disabling conditions was 'April of 2003,' when [Mr. Wickam] last worked" rather than the date the Commission accepted of November 1, 2001, and "[a]ccordingly" it was "not persuaded by Dr. Koprivica's opinion that [Mr. Wickam's] disabling bilateral knee and sleep apnea conditions preexisted [his] primary carpal tunnel syndrome injury."

The Commission's rejection of the medical and vocational expert evidence of Mr. Wickam's conditions combining to render him permanently totally disabled was based solely upon

---

[5] The Commission found Mr. Wickam's sleep apnea was disabling as of April 2003.
[6] The Commission found sufficient evidence to support finding Mr. Wickam's bilateral knee condition disabling as of July 21, 2003.

13

the date it assigned to the primary injury of carpal tunnel syndrome, rather than any disbelief of the evidence as to the existence or level of disability rendered by the bilateral knee and sleep apnea conditions when combined with the primary injury. Based on the Commission's factual determinations regarding the existence and severity of Mr. Wickam's sleep apnea and bilateral knee disabilities, and because this Court concludes that the appropriate date of Mr. Wickam's carpal tunnel syndrome injury is September 12, 2003, pursuant to the binding precedent of *Garrone*, the Commission's decision is reversed and remanded for entry of an award of permanent total disability benefits against the SIF.

_____

VICTOR C. HOWARD, JUDGE

All concur.

14